LEO CALLIER, Plaintiff-Appellant and Cross-Appellee, v. SCOTT CALLIER et al., Defendants-Appellees and Cross-Appellants.

Fifth District   No. 5—84—0066

Opinion filed March 31, 1986.

408

409

Robert C. O'Neal, of Carr, Korein, Kunin, Schlichter & Brennan, of East St. Louis, and Alan C. Kohn and John A. Klobasa, both of Kohn, Shands, Elbert, Gianoulakis & Giljum, of St. Louis, Missouri, for appellant.

Rau & Rau, of Waterloo, and Martin, Bahn & Cervantes, of St. Louis, Missouri, for appellees Scott Callier and All Steel Pipe & Tube, Inc.

JUSTICE KARNS delivered the opinion of the court:

Both parties appeal from the judgment of the circuit court of St. Clair County which ordered plaintiff Leo Callier (Leo) to transfer certain shares of stock in a close corporation as damages suffered by defendants Scott Callier (Scott) and All Steel Pipe and Tube, Inc. (All Steel), an Illinois corporation. This judgment was entered on remand from this court, which reversed a prior judgment ordering liquidation of the assets and business of All Steel. On appeal, Leo contends: (1) that, in the absence of a finding that he violated some fiduciary duty to defendants, the trial court erred in ordering him to pay damages to defendants, (2) that his actions were not the proximate cause of any damages defendants may have suffered, and (3) that, in any event, there was no proof that Scott or All Steel suffered any damages. Scott cross-appeals contending: (1) that the trial court failed to interpret properly and apply the prior judgment of this court, (2) that the damage award was insufficient to adequately redress the wrong done to defendants, (3) that an improper test was utilized to determine the going-concern value of the business, and (4) that defendants should

410

have been awarded prejudgment interest.

In the prior appeal (*Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 378 N.E.2d 405), this court found that Leo failed to prove that there was a deadlock in management or a threat of irreparable injury sufficient to require the liquidation of the assets and business of All Steel, pursuant to section 86 (a)(1) of the Business Corporation Act of 1933, as amended (Ill. Rev. Stat. 1975, ch. 32, par. 157.86(a)(1)). The cause was remanded with instructions allowing the trial court to receive further evidence in order "to fashion a fair and equitable remedy for the redress of the wrong done to appellants." (*Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 1016, 378 N.E.2d 405, 409.) Further, we indicated that in determining damages the trial court should consider the difference between the going-concern value of the business and the assets in the hands of the receiver. *Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 1015, 378 N.E.2d 405, 409.

Scott and Leo are each 50% shareholders in All Steel, which was incorporated in 1969. As a broker of steel pipes and tubes, All Steel was not a capital intensive business and was not required to conduct a substantial warehousing operation. It owned no real estate. All Steel's board of directors consisted of Leo, who is also the president, and Felix Callier. It is undisputed that Felix, now deceased, was Scott's "nominee," that he never took an active role in the management of the company and that his primary function was to act as Scott's representative. The daily management of All Steel was always handled by Leo. Although Scott was the general manager of All Steel, he lived in Florida and only occasionally traveled to the company headquarters in St. Louis. Aside from their business relationship, all three men are related: Leo is Scott's nephew, and Felix is Scott's father and Leo's grandfather.

Although All Steel lost money during 1969 and 1970, by 1973 the company was making a profit. In 1974, the industry as a whole and All Steel in particular had an extremely profitable year. Profits for 1974 were astronomical. Unfortunately, during this same year the relationship between Scott and Leo became increasingly stressful. By January 1975, Leo and Scott had begun redemption discussions. In principle, they agreed that Scott's shares would be redeemed and that Leo would continue to run All Steel.

Between January and April 1975, frequent redemption discussions were held by Leo and Scott personally and by their attorneys. These discussions proved fruitless, with Scott demanding one million after-tax dollars for his 50% share of All Steel, but he was only willing to pay Leo one sixth that amount for his 50% share. By early April, the

discussions began to focus on liquidation. On April 10 and on April 23, 1975, Scott's attorney wrote letters to Leo's attorney stating that redemption discussions had failed, that it was unlikely that they could profitably sell All Steel, that liquidation was the only solution, that all employees unnecessary to "wind down" should be terminated and that Leo should begin to "wind down" the business. Scott personally expressed this position during a meeting on April 20, 1975. On April 30, 1975, Scott changed his mind about liquidation and stated that Leo should continue to run the business. Although Leo's attorney suggested that Scott manage All Steel, Scott refused.

At least twice during April 1975, Scott stated his intention to start a company in competition with All Steel, and in fact, Scott did start two such businesses. Both businesses failed in less than one year. Leo also started a separate and competing business. On May 5, 1975, Callier Pipe and Tube, Inc. (Callier), was incorporated as a Delaware corporation. Leo remained with All Steel during the May "wind down," and began working at Callier on June 2, 1975. Callier is currently in operation. During the "wind down," Leo's attorney kept Scott's attorney fully advised as to events at All Steel. In testimony and at oral arguments, Scott conceded that there was nothing wrong with Leo starting Callier, except that he did not officially resign as an officer and director of All Steel prior to starting Callier.

The second trial focused on two primary issues, the actions of each party during the spring of 1975 and the going-concern value of All Steel, with both Leo and Scott presenting expert testimony as to the going-concern value of All Steel. Both experts considered numerous factors in their determinations including the following: the size of the company, the age of the company, the relative unmarketability of closely held stock, company management and other factors affecting the industry as a whole. Both experts noted that 1974 was an unusually profitable year and unlike any previous year in the history of All Steel and the other companies in the industry.

Dr. James P. Jennings, a Ph.D. in accounting and the chairman of the accounting department at St. Louis University, testified as an expert witness for Scott and All Steel. Although Jennings had previously valued approximately 25 businesses and testified in at least 12 trials, his prior experience was limited to the valuation of businesses involved in disputed dissolution of marriage cases. To arrive at the going-concern value of All Steel as of May 1, 1975, Jennings utilized a capitalization of earnings technique which consisted primarily of determining a figure representative of the company's future annual earning capacity and multiplying that figure by a price/earnings ratio

that would reflect the risks inherent in the investment and the nature of the stock market at that point in time. Jennings stressed the importance of selecting a truly representative year when determining the earnings and value of a company and the importance of utilizing profit and loss statements for at least five years to arrive at a base earning figure. Jennings further testified that 1974 was a "big boom year" and not representative for either All Steel or the industry. Despite this testimony, Jennings selected 1974 as his base year. Information from previous years was not used in his calculations. Utilizing 1974 after-tax earnings of $1,825,500, Jennings projected that the 1975 after-tax earnings would have been $1,420,000. Jennings testified that the drop in 1975 earnings was attributable to increased costs in early 1975. Next, Jennings determined the price/earnings ratio, using the Standard and Poor's data for the 400 industrials for the first week of May 1975. This figure was 10.0. Jennings testified that none of the Standard and Poor's 400 industrials were involved in the steel servicing centers business, that information from companies in the same type of business would have been beneficial to his evaluation, that the four companies analyzed by Leo's expert witness were in the same type of business as All Steel, that the companies analyzed by Leo's expert witness had a price/earnings ratio of between 1 and 3 for 1974 and that to look merely at a price/earning ratio of one year did not provide sufficient information to make an intelligent decision. Nevertheless, Jennings determined that the appropriate price/earnings ratio was 8.5, a 15% reduction from the one week figure of 10.0 to compensate for the inherent difficulties in marketing a privately held corporation. Multiplying the $1,420,000 earnings figure by the 8.5 price/earnings ratio, Jennings calculated the value of All Steel was $12,070,000 as of May 1, 1975, and that Scott's 50% interest in All Steel was worth $6,035,000. Finally, Jennings testified that his evaluation of All Steel's going-concern value was based on the assumption that Leo would continue to manage the company which would continue in existence and that Scott would no longer be associated with the company.

Mr. John Harwood, a vice-president and corporate valuations officer for A. G. Edwards & Sons, an investment banking and securities brokerage firm, testified as an expert witness for Leo. Prior to joining A. G. Edwards, Harwood had been involved in the steel service center business for more than 20 years. Harwood used a capitalization of earnings technique similar to Jennings' technique, but with several important differences. Harwood testified that he averaged the per share earnings from 1970 to 1974 to calculate a base earnings per

share of $338.39. He testified that the 1974 earnings were included in his calculations, but were not relied on as the sole source of information. Harwood next examined information of other steel service center businesses and selected the four public companies that he thought were most comparable to All Steel. Harwood testified that although these companies were significantly larger than All Steel, they were substantially similar in other ways, including the fact that two of them were located in the St. Louis area. Relying on this same five-year period, Harwood determined that the appropriate price/earnings ratio was 10.27, notwithstanding that it was only 1 to 3 for the same industries during 1974. Multiplying the five-year average earnings per share of $338.39 by the price/earnings multiplier of 10.27 resulted in a price per share of $3,474.24 as of April 30, 1975. Utilizing the same process with data for March 30, 1975, Harwood testified that All Steel was worth more on April 30, 1975, than it was on March 30, 1975. Harwood further testified that it was necessary to discount this price per share by a number of factors to compensate for the differences between All Steel and the comparison companies. These discount factors included the following: (1) 15% because All Steel was significantly smaller, (2) 5% because of All Steel's narrow product line, (3) 5% because of All Steel's "thin" management, (4) 5% because All Steel's debt to equity ratio was two to three times greater, (5) 5% because All Steel's 1975 first quarter earnings were not as good as the other companies, and (6) 10% because All Steel had a short operating history. The foregoing adjustments amount to a 45% discount, resulting in a per share price of $1,910.83, or a total value of $2,101,913 for the total 1,100 shares. Harwood testified that an additional 35% discount was appropriate due to the lack of marketability of stock in closely held corporations. Harwood testified that the per share value was $1,242.00 and that the going-concern value of All Steel was $1,366,244 as of April 30, 1975, which was less than the amount in the hands of the receiver after the "wind down" of the business. Harwood further testified that during the first quarter of 1975, it was not unusual for stock to be trading below book value, especially in the steel service center industry.

The trial court found that the fair and equitable way to value All Steel was to determine the value of each share as of May 1975. Relying more on Harwood's evaluation, the court set the value of each share at $3,474.24 and then applied most of Harwood's discounting factors to arrive at a final per share value of $1,910.83. The court applied a 45% discount on the value of All Steel stock. All Steel's going-concern value was set at $2,101,913 as of May 1975, or almost

$99,500 less than the $2,201,412.85 in the hands of the receiver. The court found that Leo's actions had not been malicious or fraudulent, but were instead the actions of a "frustrated, impatient and imprudent young man" whose "ill advised" actions had caused damage to Scott and to All Steel. Leo was ordered to transfer 200 shares of his All Steel stock to Scott in full satisfaction of the damages done to him and to transfer 200 shares of his stock to All Steel in full satisfaction of the damages done to it. All Steel was ordered to redeem Leo's remaining 150 shares for a total of $286,624.50. The receivership was to be terminated and the remaining assets, which consisted entirely of cash, and the records of All Steel were to be turned over to Scott.

■■ Initially, we must address Scott's contention that the trial court failed to interpret properly and apply the findings of this court in that additional evidence concerning Leo's reasons for closing All Steel and placing its assets in the hands of a receiver was admitted at retrial and considered by the trial court. Scott argues that the prior decision of this court foreclosed any additional evidence concerning the merits of Leo's actions, and that the law of the case required the trial court to address itself only to the issue of the amount of damage done to Scott and All Steel. Scott contends that the prior finding of this court was that, as a matter of law, Leo had breached his fiduciary duty and was liable for damages.

Although the findings of an appellate court are final on all questions decided (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 667, 405 N.E.2d 1220, 1225), our prior decision made no express finding as to Leo's liability. Questions of law decided in a previous appeal are binding on both the trial court and this court. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 667, 405 N.E.2d 1220, 1225.) However, the mere presentation of an issue to a reviewing court does not foreclose relitigation on "issues of fact [citations], and matters concerning the merits of the controversy between the parties which were presented to but not decided on by the appellate court [which] can be relitigated on remand." (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 667, 405 N.E.2d 1220, 1225.) The only issue we decided in the prior appeal was that the evidence presented to the trial court was insufficient to prove either a deadlock or irreparable injury within the meaning of section 86(a)(1) of the Business Corporation Act of 1933, as amended (Ill. Rev. Stat. 1975, ch. 32, par. 157.86(a)(1)), and that dissolution and liquidation of the corporation was unjustified. (*Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 1015, 378 N.E.2d 405, 409.) "Dissolution is *** a harsh remedy *** to be used only as a last resort." (2 F. O'Neal, Close Corporations sec. 9.03, at 9 (2d ed. 1971).) Although we

noted what appeared to be a breach of fiduciary duty, we left it to the trial court to balance the equities between the parties and to fashion a proper remedy.

■ Of primary importance to our determination are the trial court's findings as to the going-concern value of All Steel as of May 1, 1975. As noted in our prior decision, it would be manifestly unfair to allow one 50% shareholder "to siphon off the going-concern value of All Steel, leaving the 50-percent shareholder who was opposed to dissolution with only half of whatever assets are in the control of the receiver." (*Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 1015, 378 N.E.2d 405, 409.) At the outset, we note that the trial court findings will not be reversed unless they are palpably or manifestly contrary to the weight of the evidence. *Zokoych v. Spalding* (1984), 123 Ill. App. 3d 921, 930, 433 N.E.2d 943, 949.

Relying primarily on *Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 405 N.E.2d 1220, Scott contends that the trial court's findings as to All Steel's value were against the manifest weight of the evidence. Scott argues that the testimony and evaluative techniques of Jennings, his expert witness, were substantially similar to those sanctioned by the court in *Zokoych* and that greater weight should have been accorded to the 1974 earnings which indicated an obvious trend towards increased earnings. We disagree with both Scott's arguments and application of the *Zokoych* decision.

In *Zokoych*, the court held that the trial court finding that a close corporation has no earnings power, and thus no going-concern value, was contrary to the manifest weight of the evidence. After a careful and critical review of the evidence and testimony, the court found that the trial court should have relied on the testimony of Dr. John Langum, who testified that the appropriate method to determine the value of a close corporation was to consider the net income "in light of the company's historical record and then capitalize [it] by using an appropriate price-earnings ratio *** derived from the actual appraisal of earnings of comparable companies." (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 669, 405 N.E.2d 1220, 1227.) Langum focused specifically on 32 companies conducting businesses similar to the one he was evaluating. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 669, 405 N.E.2d 1220, 1227.) Langum also testified that he gave greater weight to the last 10 months of operation because the business and the industry were recovering from a recession and because during that period both owners were working for the company. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 670, 405 N.E.2d 1220, 1228.) The court did not establish a test or a particular method for

evaluating a close corporation, but rather considered the specific evidence before it and the particular circumstances of the case.

■ It is necessary to review the testimony to ascertain whether the trial court correctly found the going-concern value of All Steel. Placing a value on "a business is not an exact science but involves many subjective and complex determinations, shareholders may sharply disagree in their individual estimates of the value of a business interest." (1 F. O'Neal & R. Thompson, O'Neal's Oppression of Minority Shareholders sec. 2:16 (2d ed. 1985).) Both experts utilized a capitalization-of-earnings technique similar to that employed in *Zokoych*. Jennings established his earnings figure by annualizing 1975 earnings based on the 1974 earnings and his price/earnings ratio by using the general Standard and Poor's data for the 400 industrials, none of which was in the steel service center business. Harwood established his earnings figure by averaging the five-year earnings and his price/earnings ratio by analyzing the four publicly traded companies he thought were most comparable to All Steel. Even with the differences in technique, the price/earnings ratios determined by each expert were almost identical. The primary difference in the techniques, and thus the evaluation of the going-concern value of All Steel, is that Jennings relied exclusively on 1974 earnings to estimate the earnings figure, while Harwood utilized a five-year average to determine the earnings figure. Since "[e]conomic data can be interpreted in different ways for different purposes" (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 835, 413 N.E.2d 1299, 1313), the critical question is whether, under the particular circumstances of this case, the earnings figure should have been calculated on the most recent earnings or on an average of previous years. In determining the earnings figure upon which to base a capitalization of income, the court should rely on the most representative data available. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 670, 405 N.E.2d 1220, 1227.) Both experts agreed that 1974 was an unusual year and not representative of either All Steel, in particular, or of the industry, as a whole.

Furthermore, Jennings testified that his evaluation was based on the assumption that Leo would continue to manage All Steel and that Scott would no longer be associated with the company. This assumption was contrary to the facts known to Jennings at the time he prepared his evaluation. Neither Leo nor Scott was working for All Steel, and neither indicated any desire to return to All Steel. Scott testified that they were both free to quit working for All Steel and form competing businesses. The uncontested evidence is that without

Leo's management All Steel had no value beyond its net quick assets. Thus, Jennings' evaluation had absolutely no probative value as to All Steel's future earning capacity.

■ The trial court was "in a position superior to a court of review to observe the conduct of the witnesses, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." (*William Aupperle & Sons, Inc. v. American National Bank & Trust Co.* (1975), 28 Ill. App. 3d 573, 579, 329 N.E.2d 458, 463.) "When dealing with the stock of a close corporation, which has no ascertainable market value, *** it is proper for a court to consider all the circumstances of the corporation and attempt to fix the value of the stock in some rational way from such elements as are attainable." (*Ashe v. Sunshine Broadcasting Corp.* (1980), 90 Ill. App. 3d 97, 101, 412 N.E.2d 1142, 1145-46.) There is ample evidence in the record to support the trial court's findings, and "[i]n close cases, where findings of fact must necessarily be determined from the credibility of the witnesses (such as the case at bar), it is particularly true that an appellate court will defer to the findings of the circuit court unless they are against the manifest weight of the evidence." (*Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 124, 481 N.E.2d 712, 714.) The findings of the circuit court that the going-concern value of All Steel was $2,101,913, almost $99,500 less than the cash in the hands of the receiver, were not contrary to the manifest weight of the evidence. Since the going-concern value of All Steel was less than its actual cash value in the hands of the receiver, Scott did not sustain damage as a result of the loss of his going-concern value interest.

■ Next, we must consider whether Leo acted improperly in closing All Steel and whether Leo breached any fiduciary duty owed to Scott. The trial court expressly found that Leo's actions in winding down the business were neither malicious nor fraudulent, but were the "ill advised" actions of a "frustrated, impatient and imprudent young man." In reaching this finding, the trial court had before it a significant amount of evidence as to the actions of both Scott and Leo. The court was in a position to observe the witnesses and to weigh and balance their testimonies. The court did not find that Leo's actions were a breach of his fiduciary duty. On the record presented, we concur. Although the court did not state the exact nature and extent of the damages sustained by Scott, Leo was ordered to transfer 200 shares of All Steel stock, valued at $382,166, to Scott. All other damages claimed by Scott were denied. Both parties appeal from that order.

Leo contends that the trial court erred in awarding damages to

Scott because his actions did not cause Scott to suffer any damages. Leo argues that Scott must prove that Leo's actions were the proximate cause of his damages. Leo contends that since the trial court did not find he had breached his fiduciary duty and found that his actions were neither malicious nor fraudulent, the only wrongful act he could have committed was closing All Steel on May 1, 1975, and that act did not cause damage to Scott. Leo further argues that Scott himself caused whatever damages he now claims. We agree that, on the particular facts of this case, a damage award to Scott is contrary to both the findings of the trial court and the manifest weight of the evidence.

■ As the party seeking to recover, Scott must prove that he sustained damages. (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36, 42.) Scott claims damages for lost salary and loss of use of the money. Additionally, Scott seeks to recover his attorney fees and punitive damages. Scott argues that the damages awarded to him were inadequate to fairly and equitable compensate him for his losses.

■ We find Scott's arguments untenable for a number of reasons. First, "damages may not be awarded on the basis of conjecture or speculation" (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36, 42), and the damages "must *** be proven to be the proximate result of the complained wrong." (*Classic Bowl, Inc. v. AMF Pinspotters, Inc.* (7th Cir. 1968), 403 F.2d 463, 467.) Scott's damage claims are highly speculative in nature and are not the proximate result of any action on Leo's part. Dr. Leroy Grossman, a university professor, testified concerning Scott's alleged economic losses resulting from the closing of All Steel. Grossman based most of his testimony on Jennings' report, which we have already discounted due to its highly speculative nature. Grossman further assumed that All Steel would remain a profitable company and would continue to pay Scott the same salary he received in 1974. Scott's argument further assumes that he would continue to receive that salary for 10 years. Scott's own testimony contradicts these suppositions. Scott testified that he was in the process of withdrawing from the business, that he had no interest in managing the business and that he wanted to sell his 50% interest. Scott's position assumes that Leo would continue to manage All Steel, when the simple reality of the situation was that Leo had already left All Steel and that he had no intention of returning. The facts provide no basis for a damage award.

■ Second, absent a contractual agreement or a statute providing for an award of attorney fees, such relief cannot be awarded.

(*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 166, 390 N.E.2d 859, 865.) Despite his admission that normally attorney fees are not awarded to winning litigants, Scott contends that such an award is justified in this case because of Leo's fraudulent conduct. The trial court found that Leo's actions in "winding down" the business were not fraudulent. Even when allowed, the awarding of attorney fees is within the discretion of the trial court. Here, the trial court denied any recovery for attorney fees. We find no reason to disturb this determination.

■ Third, relying primarily on *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805, Scott seeks punitive damages in the amount of Leo's salary and retained earnings for the past 10 years as well as a constructive trust on Callier. Scott argues that as a 50% shareholder and director, Leo owed a duty to Scott to deal with him in a fair, honest and open manner. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 666, 344 N.E.2d 805, 814.) Logically, as a 50% shareholder and director-in-fact, Scott's duties were no less. Scott contends that Leo's breach of his fiduciary duty warrants such an award. However, the trial court did not find that Leo had breached his fiduciary duty. Scott further argues that punitive damages are appropriate where the wrongdoer's actions are accompanied by wantonness, malice, fraud, and oppression. (*Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 317, 487 N.E.2d 436, 438.) Scott's own testimony negates any possibility of an award of punitive damages. Scott testified that Leo was free to leave All Steel at any time and start a competing business. Scott started two competing businesses. Scott would have this court punish Leo for actions Scott admitted Leo had every right to take. We find no basis for an award of punitive damages.

■■ Scott has failed to prove that he sustained any damages; the liquidation value of All Steel was greater than its going-concern value, and all other claimed damages are either far too speculative or are contrary to the manifest weight of the evidence. Even if Scott had proved that he sustained some damages, he must prove that Leo's actions were the proximate cause of those damages. (*Politakis v. Inland Steel Co.* (1983), 118 Ill. App. 3d 249, 254, 454 N.E.2d 811, 815.) The evidence and admissions of the parties do not support such a claim. Here, we are dealing with two 50% shareholders who, by their own admissions, were free to leave All Steel and start competing businesses. In light of the fact that Scott refused to assume the management of All Steel and the fact that Leo was free to leave the company managementless, it appears that Leo's actions in "winding down" the affairs of the corporation may actually have prevented unnecessary losses of the corporate assets and even greater damage to

all parties. Leo, in exercising his right to leave and start a competing business, took none of All Steel's assets, trade secrets, or confidential customer or supplier lists. Scott, who was kept fully informed by Leo's attorney, sat idly by and allowed Leo to "wind down" the business and convert all corporate assets to cash. Thus, on the facts of this case, Leo's actions were neither improper nor a breach of his fiduciary duty to Scott. The damage award to Scott was improper and is reversed.

Finally, we must address the issue of whether Leo breached any fiduciary duty owed to All Steel or whether his actions were the proximate cause of any damages All Steel may have suffered. Without finding any particular damage or the nature or extent of any damage the corporation may have sustained, the trial court ordered Leo to transfer 200 shares of All Steel stock, valued at $382,166.00, to the corporation to pay receivership fees. All other damages sought by Scott on behalf of All Steel were specifically denied. The court directed All Steel to pay the receivership fees and to pay for its attorney fees. Both parties appeal from these orders.

The evidence shows that 1974 was an extremely profitable year for All Steel and for the industry as a whole. For reasons we need not address, All Steel's earning history appears to have been exaggerated. By early 1975, All Steel was suffering from a number of serious maladies. The "big boom" of 1974 was over. Sales, profits and incomes were swiftly returning to pre-1974 levels. The corporation was having difficulties with its suppliers and with the Internal Revenue Service. Discord between Scott and Leo was taking its toll on the corporation. As Scott's attorney noted, these two 50% shareholders could not agree on the time of day. Scott was using corporate employees and assets for his personal benefit. The trial court found that Scott owed All Steel $34,000 for his personal expenses that he had paid out of corporate funds. Employees were disgruntled and some key employees were threatening to quit unless Scott resigned. "Dissension among the share holders falls with a heavy impact in a close corporation *** [and] once dissatisfaction or distrust has developed, friction is likely to continue to grow." (2 F. O'Neal, Close Corporations sec. 9.02, at 3 (2d ed. 1971).) Although the events herein predate the Close Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 1201 *et seq.*), All Steel would have been a good candidate for dissolution pursuant to section 14 of the Act (Ill. Rev. Stat. 1977, ch. 32, par. 1214). It is unlikely that All Steel could have continued to operate in the best interests of both shareholders. Ill. Rev. Stat. 1977, ch. 32, par. 1214(a)(3).

■■ Absent a breach of fiduciary duty or an abuse of discretion, the court will not substitute its judgment for that of the businessman. (*Santarelli v. Katz* (7th Cir. 1959), 270 F.2d 762, 768.) The record indicates that in May 1975, Leo had few choices: he could continue to operate All Steel in a state of disharmony among shareholders which was affecting management/employee relationships; he could walk away and leave All Steel managementless; or he could convert all assets to cash and petition the court for dissolution of the corporation. If the dissatisfaction and strife between the shareholders "has been so long and bitter that the former relationship of congeniality and trust cannot be reestablished, there is little left that an unhappy shareholder can do except sell out or bring about the dissolution of the business." (2 F. O'Neal, Close Corporations sec. 9.03, at 9 (2d ed. 1971).) In selecting the latter, Leo did not abuse his discretion nor did he breach any fiduciary duty. The fact that our prior decision held that Leo's evidence was insufficient to compel dissolution did not mean that Leo was wrong to seek relief in the court. "Even if a business is still making profits, a dissatisfied shareholder may be wise to force a dissolution and withdraw his accumulated assets from the risks of the enterprise. Ordinarily, the profit making position of the corporation will eventually be lost if there is serious dissension among the active participants." (2 F. O'Neal, Close Corporations sec. 9.03, at 9 (2d ed. 1971).) Leo's actions did not harm All Steel, and the order compelling him to transfer 200 shares of his stock to All Steel is reversed.

■■ The final question is who should bear the expenses of the receivership which include corporate attorney fees and expenses that would have been incurred had All Steel continued to do business. Even though our prior holding was that All Steel should not be dissolved, "[t]he trial court clearly had the power to appoint a receiver." (*Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 497, 285 N.E.2d 574, 580.) The expenses of the receivership should be charged against the assets of the corporation, and thus indirectly borne by both Scott and Leo. (*Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 497, 285 N.E.2d 574, 580.)

For the foregoing reasons the order of the trial court will be modified to require Scott to repay All Steel the sum of $34,000 for Scott's personal expenses paid out of corporate funds. The order of the trial court requiring Leo to transfer 200 shares of his stock to Scott and to transfer 200 shares of his stock to All Steel is reversed. The order of the trial court requiring All Steel to redeem 150 shares of Leo's stock is modified to require All Steel to redeem 550 shares of Leo's stock.

422

In all other respects the order of the trial court is affirmed. This cause is remanded to the trial court for further proceedings not inconsistent with this opinion.

Affirmed in part; modified in part; reversed in part and remanded.

KASSERMAN, P.J., and JONES, J., concur.