HAROLD CHAPMAN, Counterplaintiff-Appellee and Cross-Appellant, v. CROWN GLASS CORPORATION *et al.,* Counterdefendants-Appellants and Cross-Appellees.

First District (1st Division) No. 1—88—3351

Opinion filed April 30, 1990.—Rehearing denied May 30, 1990.—Modified opinion filed June 4, 1990.

998

Harvey J. Barnett & Associates, of Chicago (Harvey J. Barnett and Michelle F. Kantor, of counsel), for appellant Morton Blitstein.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Michael J. Leech and Kearney W. Kilens, of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Harold Chapman (plaintiff)[1] brought an action in the circuit court of Cook County against Crown Glass Corporation (Crown), Morton Blitstein (defendant), and M.A.B., Inc., alleging intentional interference with contract, intentional interference with prospective economic advantage, and retaliatory discharge in connection with the termination of his employment with Crown. Following a jury trial on plaintiff's third-amended complaint, the jury returned a verdict in favor of defendant, Crown and M.A.B., Inc. on the retaliatory discharge count and a verdict against defendant on the intentional interference counts in the amount of $150,000. Defendant appeals from the judgment entered on the intentional interference counts, and plaintiff cross-appeals on the issue of punitive damages.

At trial, the following evidence was adduced concerning Crown and the events preceding plaintiff's employment termination. Crown, a glass products distributing business, was founded in 1947 by defendant and Harold Serlin. At its inception, Crown was owned by defendant, Harold, and Harold's brother, Robert Serlin. Plaintiff was hired as Crown's comptroller in 1962, elected to its board of directors in 1963, and elected its first vice-president in 1969. In the 1970's, defendant's son Berle and Harold's son-in-law, Richard Wasserberg,

---

[1] Chapman's action was originally filed as a counterclaim to Crown Glass Corporation's complaint against Chapman, Richard Wassenberg and Harold Serlin, which sought to enjoin a meeting of Crown's board of directors. Crown's complaint was subsequently dismissed by agreed order, and Chapman's counterclaim continued as an independent cause of action.

were brought into the business.

In 1975, Robert filed a lawsuit against Crown, defendant and Harold, seeking an accounting and injunctive relief, alleging, *inter alia*, that they appropriated business opportunities for their own financial benefit. Plaintiff testified that during the pendency of the lawsuit, Berle instructed plaintiff and Ancel Schmidt, who was the president of Crown's subsidiary company, to perjure themselves to protect Crown and defendant. Berle was upset that plaintiff had spoken to Harold about the matter, and he questioned plaintiff's loyalty during a heated argument over the matter. In issue were certain travel and entertainment expenses of Berle's which were entered on the subsidiary's books instead of Crown's books. Plaintiff testified that defendant eventually agreed to transfer the expenses from the subsidiary's books to Crown's books after plaintiff discussed the matter with him.

Robert's lawsuit was settled in August 1977. Crown repurchased his stock, leaving defendant and Harold the sole shareholders of Crown. Plaintiff testified that around this period of time, defendant discussed Crown's future plans with him, including the plan to have plaintiff, Berle, and Richard form a committee to run Crown in the contingency that defendant and Harold were incapacitated.

In 1976, while plaintiff was absent due to his recuperation from a heart attack, defendant arranged to have Sid Weingard, an employee under plaintiff's supervision, report directly to him. Defendant testified that Weingard thereafter continued to report to him. Defendant further testified that he instructed Weingard in 1976, despite a prior oral agreement with Harold that Berle and Richard were to be equally compensated, to give Berle a raise without discussing the matter with Harold or plaintiff.

Plaintiff testified that defendant "docked" him for a week's pay in October 1977, even though he knew plaintiff was in the hospital for internal bleeding as a result of an automobile accident. Plaintiff further testified that defendant requested that plaintiff give him the Crown bylaws books on November 9, 1977, when he had previously examined the books in plaintiff's presence. Berle made a similar request on November 17, 1977.

Marshall Burman, an attorney from Arvey, Hodes, Costello and Burman who represented Crown, testified that he discussed the perils of small closely held corporations with defendant, including the risk that there could be a deadlock on the board of directors (the Board). He could not remember the particular time he discussed these matters, but assumed it was around the time Crown repurchased Robert's interest.

In November 1977, Crown hired Touche Ross & Co. (Touche Ross), an outside accounting firm. On November 18, 1977, Berle Blitstein met with Edward Goldstein and other members of Touche Ross and arranged to have them search for a new comptroller.

On December 2, 1977, defendant requested plaintiff to resign from the Board and informed him that Harold concurred in the request. Defendant testified that he and Harold agreed that only family members should be officers and directors of Crown, while Harold testified that defendant discussed plaintiff's resignation from the Board with him, but he opposed it.

Plaintiff adduced a letter dated December 7, 1977, in which plaintiff related to defendant the content of their December 2 conversation, including defendant's desire to have only family members serve on the Board and his assurances that plaintiff's resignation would not affect his relationship, or his position as an officer, with Crown. Plaintiff testified that after defendant received the letter, he denied having made the statements and wrote "Not Accepted" on the resignation.

At the annual Board meeting on February 21, 1978, the Board took action to elect the five directors. The minutes of the meeting indicated that only four nominations were made and four directors were elected—defendant, Berle, Harold, and Richard. Harold testified that he mentioned plaintiff's name at the meeting, although he later stated that he did not remember if he nominated plaintiff. Harold further stated that defendant proposed attorney Burman for the position as the fifth director, but he rejected the proposal. The minutes of the February 21 meeting also indicated that defendant made two proposals, one to increase his salary above that of Harold and one to create a new position of executive vice-president for Berle. The Board was stalemated by a 2 to 2 vote as to both proposals, with Harold and Richard on the one side and the Blitsteins on the other.

Berle's personal friend from the country club, Edward Goldstein of Touche Ross, testified to a March 14, 1978, letter Touche Ross issued regarding the 1977 audit it performed, which listed numerous criticisms of the accounting department. Goldstein testified that when he attended the February 1978 Board meeting and reported the same matters as related in the letter, both Harold and defendant expressed their concern. Melvin Strauss, Crown's outside auditor for the previous 16 years, testified that there was a continual problem with obtaining year-end financial statements on a timely basis and that these statements are an extremely valuable management tool to a company.

On June 29, 1978, defendant sent a letter warning all the directors that "injunctive relief, damage suits or dismissal" would be pur-

sued for violations of their duties of confidentiality in connection with trade secrets and customer lists. Defendant testified that the letter was directed towards Richard because he believed he was "blabbering" confidential company information.

On July 5, 1978, defendant fired plaintiff. The following evidence was presented as to the reasons for plaintiff's employment termination and the events succeeding his termination.

Defendant testified that he intended to end plaintiff's employment relationship and that he discussed his intention to fire plaintiff with Harold on the morning of July 5 before he fired plaintiff. Harold testified that he consulted his own counsel, Earle Rappaport, when he learned of plaintiff's employment termination through a third person. Harold also testified that no directors or officers were previously terminated without both defendant's and his agreement. In a July 5, 1978, letter to defendant, Rappaport noted the considerable activity conducted in the corporation without Harold's authority, including plaintiff's employment termination, and advised defendant that further actions without consultation with Harold would not be tolerated.

Plaintiff testified that defendant and Harold shared duties at the same time each one had duties he handled exclusively. Plaintiff introduced the corporate bylaws into evidence, which set forth the duties of the president and chairman of the board:

> "The president and chairman of the board of directors shall be the principal executive officers of the corporation and shall, in general, supervise and control all of the business and affairs of the corporation. The president in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the board of directors from time to time. The chairman of the board of directors *** in general shall perform all duties incident to the office of president and such other duties as may be prescribed by the board of directors from time to time."

Over defendants' objection, the circuit court allowed Harold's testimony as to the reasons plaintiff was terminated:

> "Because [defendant] was trying to isolate me, and he was trying to get the people that were friendly with me, that worked together with me and the company, that's the reason for that thing, and he had a pattern that he was going down the line one by one to do the same thing with everybody that was in the organization. Everybody in the organization, he fired. He fired everybody. He was firing everybody."

Harold further testified that defendant had fired Max Holtzman and

Robert Serlin and "a couple of gals" in the office whose names he could not recall. Holtzman testified that he voluntarily resigned in April 1979.

Over objection of defendant's counsel, plaintiff elicited testimony from defendant as to the reasons he fired plaintiff. Defendant testified that he had been dissatisfied with plaintiff's work habits and his performance with their subsidiary, plaintiff's failure to automate Crown's bookkeeping and accounting systems, the four-to-five-month period plaintiff took to issue the audit reports, and plaintiff's absence from the office. Plaintiff denied these performance inadequacies. He testified that he missed work only on doctor's orders and that defendant was not in a position to observe his hours; that no complaint was ever made about his performance at the subsidiary; that at no time did he receive a directive to install a computer system and defendant refused his proposals to arrange for computer time through a service bureau; and that no complaint was ever made in his 17-year employment as to the time he took to complete the audit.

Harold testified that he and defendant had some problems after July 1978. He stated that, with plaintiff's absence, defendant "took over the whole reins" and "a lot of things that was [sic] going on there that [defendant] was doing, without the consent of Harold Serlin as a co-officer, co-owner, whatever you want to call it, with him." He further stated, "after [plaintiff] was fired, then I saw the handwriting on the wall, all the way down. The next was going to try to be me or [Wasserberg]. Like they were trying to buy my stock at a ridiculous price, and that's the way they worked."

Ancel Schmidt testified at some time defendant directed him not to give information to Harold.

In August 1978, defendant and Harold discussed a buyout of each other's interest in Crown. Rappaport testified that when negotiations had "bogged down" in September 1978, he discovered a loophole in the Crown bylaws' requirement of five directors, indicating the continuation of plaintiff as the fifth director. He testified that he informed plaintiff of this situation in a meeting attended by plaintiff, Harold and himself and admitted that his motive was to gain a strategic and tactical advantage for Harold over defendant by having Harold gain control over the Board and placing defendant in a position where he would have to sell his interest. Rappaport also referred to a plan among the three as to the future of the company which would include plaintiff's employ in the company.

Plaintiff testified that he agreed to Rappaport's and Harold's request that he join them in calling a Board meeting because he desired

to return to Crown's employ, but stated "[o]ne of the things we discussed, if I signed that call, I would be free to vote as I saw fit to vote." Rappaport sent out the notice dated September 13, 1978, notifying the directors of the Board meeting, indicating that plaintiff continued to serve as a director in accordance with the bylaws. The notice also stated that the purpose of the meeting was to consider certain resolutions, including the refunding of Berle's unauthorized $10,000 salary increase and the Board's reviewing all contracts that defendant or Berle had entered into the previous two years. Defendant admitted that a contract existed at this time with a customer, Mogen-David, in which Mogen-David conditioned the contract on defendant's remaining president of Crown.

Before the Board meeting, Crown's counsel filed an action in the chancery division to enjoin the Board meeting. A temporary restraining order was granted and later extended. In April 1979, plaintiff filed this action. Plaintiff wrote a letter to Rappaport in September 1979, stating "it seems to me [the continuances in the injunction action] have been closely tied to [Harold's] negotiations with [defendant] on a buy/sell agreement."

In October 1979, defendant and Harold entered into an agreement under which defendant purchased Harold's interest in Crown and became the sole shareholder of Crown. Defendant testified that the purchase was a personal gain for him as well as the welfare of the company.

Plaintiff testified that following his termination from Crown, he lost his annual salary of $39,000, annual year-end bonuses of $5,000, Crown's profit-sharing contribution, and insurance benefits. He received his profit-sharing distribution of $83,000, but testified he was unable to invest the sum for retirement because he needed it to support his family. Plaintiff found only *per diem* accounting work until he rejoined his former accounting firm in 1983.

On appeal, defendant contends that the circuit court erred in denying his motion for a judgment notwithstanding the verdict because there was insufficient evidence to support the jury's verdict. He alternatively contends that the circuit court erred in denying his motion for a new trial based upon prejudicial trial errors.

The torts of intentional interference with contractual rights and intentional interference with a business expectancy are closely allied with each other, both stemming from the recognition that a person's business relationships constitute a property interest which should be protected from unjustified interference. (*Madonna v. Giacobbe* (1989), 190 Ill. App. 3d 859, 546 N.E.2d 1145; *Belden Corp.*

*v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 413 N.E.2d 98.) The elements of the former include (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of this contractual relation, (3) the defendant's intentional and unjustified inducement of a breach of the contract which causes a subsequent breach by the other, and (4) damages (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 545 N.E.2d 672); while the elements of the latter tort include (1) the existence of a valid business expectancy by plaintiff, (2) the defendant's knowledge of the expectancy, (3) the defendant's intentional and unjustified interference which prevents the realization of the business expectancy, and (4) damages (*Madonna*, 190 Ill. App. 3d 859, 546 N.E.2d 1145; *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137).

■ In considering defendant's contention as to the sufficiency of the evidence that his conduct in terminating plaintiff's employment with Crown was unjustified, we note that courts have recognized a qualified privilege to interfere with a contractual or prospective business relationship in instances where the defendant has acted to protect an interest which the law deems to be of equal or of greater value than the plaintiff's contractual rights. (*HPI*, 131 Ill. 2d 145, 545 N.E.2d 672; *Madonna*, 190 Ill. App. 3d 859, 546 N.E.2d 1145.) The parties here do not dispute that such an interest is involved. Illinois courts have deemed the duty of corporate officers and directors to their corporations' shareholders outweighs any duty they may have toward other contractual parties and thus have recognized a privilege for corporate officers and directors to use their business judgment and discretion on behalf of their corporations. (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 249; *HPI*, 131 Ill. 2d at 157, 545 N.E.2d at 677; *Swager v. Couri* (1979), 77 Ill. 2d 173, 190-91, 395 N.E.2d 921, 927-28.) This qualified privilege applies to situations involving a corporate officer's or employee's "interference" with the corporation's contractual relation between the corporation and an employee that results in the termination of the employee's at-will employment. *Mittelman*, 135 Ill. 2d 220; *Worrick v. Flora* (1971), 133 Ill. App. 2d 755, 272 N.E.2d 708.

While the parties here do not dispute that plaintiff bore the burden of overcoming defendant's qualified privilege to terminate plaintiff's employment (see *HPI*, 131 Ill. 2d 145, 545 N.E.2d 672; *Swager*, 77 Ill. 2d 173, 395 N.E.2d 921), they disagree as to the proof required to overcome the privilege. Defendant claims that the circuit court improperly instructed the jury that he could be found liable for tor-

tiously interfering with the corporation's contractual relationships only "if he acted for his own personal interest and contrary to the best interests of the corporation." Citing *Langer v. Becker* (1988), 176 Ill. App. 3d 745, 531 N.E.2d 830, and *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 229 N.E.2d 514, defendant asserts that plaintiff must prove, and the jury should have been instructed, that defendant had actual malice, which is a positive desire and intention to injure another person.

██ Since the filing of appellate briefs here, the Illinois Supreme Court has expounded upon the "actual malice" standard set forth in *Arlington Heights*. In *HPI*, the supreme court explained that actual malice, or an unjustified conduct, would be proven by showing conduct "which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." (*HPI*, 131 Ill. 2d at 158, 545 N.E.2d at 678.) In applying the standard to the corporate privilege, the court explained that conduct would not be justified where the interference is solely for the person's own gain *or* is solely for the purpose of harming the plaintiff since such conduct would not have been done to further the corporation's interests. (*HPI*, 131 Ill. 2d at 158, 545 N.E.2d at 678; see also *Mittelman*, 135 Ill. 2d at 249.) The circuit court's instruction here was consistent with supreme court case law and reflected plaintiff's theory at trial that defendant's decision to terminate plaintiff was not justified because it was made to further his plan to isolate Harold, which plan was part of a broader scheme to force Harold to sell his interest in Crown.[2]

██ We turn now to whether plaintiff has presented a sufficient theory of liability to meet his burden of proving that defendant acted for his own personal interest and contrary to the best interests of the corporation. The recent supreme court decision in *Mittelman* demonstrates that plaintiff has presented such a theory. In *Mittelman*, our supreme court found that a fired law firm associate's allegations that his supervisor had made false statements to the firm in order to preserve his own reputation were sufficient not only to demonstrate that the supervisor acted for his personal gain but also to prove that the

---

[2]We note the confusion expressed by defendant on appeal as to the theory presented to the jury. Defendant asserts that three theories were presented to the jury: that defendant lacked corporate authority pursuant to the bylaws to terminate plaintiff, that defendant terminated plaintiff's employment to further a deadlock on the Board, and that defendant terminated plaintiff's employment to "isolate" Harold. We agree with plaintiff that the record demonstrates a single theory of liability was presented to the jury.

conduct was contrary to the best interests of the corporation. It reasoned that, even if the employee was responsible for a major corporate loss, it was not in the best interests of the corporation to receive false information regarding one of its employees, nor was it in the best interests of the corporation for the supervisor to vindicate himself by unjustly imputing fault to another. (*Mittelman*, 135 Ill. 2d at 250.) Similarly, plaintiff here, if successful in proving his theory, would demonstrate a personal gain for defendant and conduct which was against the best interests of the corporation, as it would not be in the best interests of the corporation to have a key employee fired in order to force out a major shareholder, even if the evidence would demonstrate his work was in some respects inadequate.[3]

■ In reviewing whether plaintiff produced sufficient evidence to prove the above theory, we are mindful that to be entitled to a judgment notwithstanding the verdict, defendant must demonstrate that all the evidence, when viewed in aspects most favorable to plaintiff, so overwhelmingly favors defendant that no contrary verdict based upon that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513.) We will first analyze the evidence as it relates to defendant's overall scheme to force Harold to sell his corporate shares and then as it relates to plaintiff's termination as part of a subplot to isolate Harold.

When viewing the evidence of defendant's overall scheme in a light most favorable to plaintiff, it indicates the following: Defendant attempted and succeeded in a buyout of Harold's shares in August 1978. Defendant and Harold were having problems as early as the February 1978 annual meeting, and the problems escalated. The jury could infer that defendant intended to create a deadlock or a swing vote on the Board from evidence that defendant's attorney discussed the perils of a deadlock with defendant and evidence that defendant nominated his attorney for the Board position when he purportedly removed plaintiff from the Board to limit the Board to family members. The jury could also infer that defendant sought to make the corporation less valuable to Harold in a buyout situation than to himself from evidence that defendant had executed a contract with a cus-

---

[3]Evidence was also introduced at trial as to defendant's authority to fire plaintiff under the corporate bylaws. Defendant has devoted much of his argument on appeal to this issue. Plaintiff argues that he presented the evidence of the corporate bylaws to demonstrate that plaintiff's termination was not in the best interests of the corporation. Because we find, under *Mittelman*, that the alleged conduct would be contrary to the best interests of the corporation regardless of whether defendant had authority under the corporate bylaws, we need not determine this issue.

tomer which contained a condition that the customer could terminate the contract if defendant did not remain Crown's president. In light of the above evidence, defendant has not demonstrated that the evidence so overwhelmingly favors him that the jury could not conclude that defendant had a scheme to force Harold to sell his interest in Crown.

When viewing the evidence relating to defendant's plan to "isolate" Harold in a light most favorable to plaintiff, the jury could find such a plan from evidence that defendant informed the president of Crown's subsidiary to withhold information from Harold, that defendant was not consulting Harold before taking certain actions such as granting a pay raise in contravention of an earlier agreement, and that defendant had issued a letter admittedly directed to Harold's son-in-law threatening dismissal.

As to the evidence that defendant fired plaintiff to further this isolation plan, plaintiff offered evidence from which the jury could find that defendant was concerned with plaintiff's loyalty to Harold and plaintiff's lack of loyalty to defendant. Defendant's son Berle expressed his dissatisfaction with plaintiff's loyalty to defendant and the fact that plaintiff apprised Harold of Berle's financial dealings. Harold indicated to defendant his desire to keep plaintiff on the Board, and defendant had taken actions to remove plaintiff from the Board in an attempt to replace him with a swing vote. This evidence, together with testimony that defendant examined the bylaws and the next day arranged to have Touche Ross search for plaintiff's replacement, that defendant discharged plaintiff without the consent of Harold, that defendant lied to plaintiff about Harold's concurrence in the decision, and evidence from which a trier of fact could conclude that defendant's reasons for discharging plaintiff were a pretext for defendant's true motive, is sufficient for the jury to conclude that defendant fired plaintiff to further his isolation plan.

 Accordingly, viewing the evidence offered to support plaintiff's theory that defendant acted solely for his own personal gain and contrary to the best interests of the corporation in a light most favorable to plaintiff, we hold that defendant failed to demonstrate that the evidence so overwhelmingly favors him that no contrary verdict based upon that evidence could ever stand.

 Before turning to the evidence relating to the other elements of plaintiff's cause of action, we will first address defendant's contention that he should be granted a new trial due to the admission of certain testimony relating to the issue of his qualified privilege. Defendant argues that Harold's deposition testimony that defendant was

trying to isolate him by firing everyone close to him at Crown was highly prejudicial to him because it was conclusory, speculative and reached an ultimate issue in the case. Plaintiff argues that the testimony was proper because defendant put in issue whether Harold's objections to plaintiff's discharge were genuine and whether he was actually affected by plaintiff's discharge. The record demonstrates that defendant sought to show that Harold agreed with defendant's grievances and that Harold's objections were solely to gain leverage to force the issue of a buyout with defendant. We believe that Harold's testimony was properly admitted to rebut these contentions. In any event, in light of the evidence previously set forth, we believe that any error in the admission of this testimony was not so prejudicial as to warrant a new trial.

Defendant next contends that plaintiff failed to present sufficient evidence on the element of the existence of a valid contractual relationship or the reasonable expectancy of entering into a valid business relationship. He asserts that Crown was not willing and desirous of continuing plaintiff's employment relationship and therefore plaintiff could not prevail as a matter of law.

■ The fact that the employment relationship or prospective employment relationship is at will is immaterial to whether there exists a valid contractual relationship or prospective business relationship in tortious interference actions. (*TAD, Inc. v. Siebert* (1978), 63 Ill. App. 3d 1001, 1006, 380 N.E.2d 963, 967.) Plaintiff need show only that both parties would have been willing and desirous of continuing the employment relationship for an indefinite period of time. *TAD*, 63 Ill. App. 3d at 1006, 380 N.E.2d at 967.

■ Although defendant presented some evidence to show that defendant was dissatisfied with plaintiff's work performance, he has not demonstrated that, when viewed in aspects most favorably to plaintiff, the evidence so overwhelmingly favors him that no jury would find that Crown would have been willing and desirous of continuing plaintiff's employment relationship for an indefinite period of time. In its function to determine the credibility of the witnesses, the jury could have rejected defendant's testimony as it related to plaintiff's job performance. Plaintiff also presented evidence showing that he was a key employee with a 17-year relationship with Crown at the time of his discharge, that defendant had assured him that his relationship and position with Crown would continue shortly before his discharge, and evidence from which the jury could find that Harold was content with his work performance.

■ Addressing now the other alleged trial errors which defend-

ant contends require a new trial, defendant first refers to the trial judge's refusal to submit certain jury instructions tendered by defendant. Defendant asserts that he was entitled to certain jury instructions on the issue of the corporate bylaws and defendant's authority to terminate plaintiff. We find that the trial judge did not err in refusing these instructions where plaintiff's theory that defendant was not privileged to fire plaintiff based upon the bylaws had been rejected by the trial judge. Furthermore, where the jury is fully instructed upon the law, it is not reversible error to refuse further instructions even though they set forth correct principles of law. (*Crosby v. DeLand Special Drainage District* (1937), 367 Ill. 462, 470, 11 N.E.2d 937, 941-42.) By instructing the jury as to defendant's privilege and the proper standard to apply in determining whether plaintiff overcame the privilege, the jury was correctly and fully instructed upon the law in the case. Finally, any instructions on the bylaws would have improperly emphasized a portion of the evidence.

Defendant also argues that he was entitled to certain instructions relating to plaintiff's employment relationship or prospective employment expectancy. Defendant's tendered instruction that, in interference with at-will employment contract cases, both parties must be willing and desirous of continuing the relationship was substantially the same as the instruction tendered by the trial judge. The trial judge also instructed the jury that plaintiff had the burden of proving that he had an expectancy of future economic benefit in his employment relationship with Crown. Thus, while the other instruction tendered by defendant, that "one who is claiming a tortious interference with prospective employment must establish proof of a reasonable expectancy of that employment, and the mere hope of continued employment, without more, will not suffice," sets forth correct principles of law, we find that the tendered instructions fully and correctly instructed the jury on the law.

We next address the trial errors claimed by defendant on the issue of damages. He contends that the jury was impermissibly allowed to speculate that plaintiff would have remained at Crown through the date of trial where the evidence indicated that defendant was dissatisfied with plaintiff's performance and had been searching for a possible replacement for plaintiff since November 1977. As plaintiff urges, defendant's tortious actions should not preclude plaintiff from asserting that but for those actions his employment with Crown would have continued beyond October 1979. Furthermore, under the principle that damages must be proven to be the proximate result of the complained wrong and may not be awarded on the basis

of conjecture or speculation (*Callier v. Callier* (1986), 142 Ill. App. 3d 407, 418, 491 N.E.2d 505, 512), it was not unduly speculative for the jury to find that plaintiff's 17-year employment as a key employee with Crown would have continued for an indefinite period of time but for defendant's tortious actions.

■■■ Defendant also contends that the jury was impermissibly allowed to speculate as to the amount of plaintiff's annual bonus and earnings in the profit-sharing plan. Plaintiff produced evidence to show that every year, except those in which he was hospitalized, he received a bonus. He also presented evidence that every year Crown's profit-sharing contribution on his behalf increased. He further testified that, based upon his past investment experience as a trustee for the profit-sharing plan, interest would have accumulated annually at an average of approximately 10%. This evidence is sufficient to present the issue of plaintiff's annual bonus and profit-sharing earnings to the jury. The fact that plaintiff's bonuses and profit-sharing could not be calculated with mathematical precision does not render the damages unduly speculative. See *Midland Hotel Corp. v. Reuben H. Donnelly Corp.* (1987), 118 Ill. 2d 306, 315-16, 515 N.E.2d 61, 66.

■■■ Defendant's last contention regarding damages is that the court's allowance of the "investment value" in the profit-sharing calculations permitted the jury to award plaintiff "double recovery" because plaintiff could have invested his lump-sum distribution and earned interest thereon. Defendant misplaces his reliance on *National Wrecking Co. v. Coleman* (1985), 139 Ill. App. 3d 979, 487 N.E.2d 1164, to support this contention. In *National Wrecking*, the court found that the plaintiff, in seeking "lost investment value" on the $82,100 loss from the defendant's breach of contract, in effect was improperly seeking interest on its damages. (*National Wrecking*, 139 Ill. App. 3d at 984, 487 N.E.2d at 1167.) Here, however, plaintiff is not seeking interest on his damages, but seeking his entitlement to employment benefits in the form of his employer's contributions and earnings on the contributions under a profit-sharing plan. He subtracted the lump sum he received as his "vested" interest on his discharge, and he testified that he was unable to reinvest the lump sum because he needed it to support his family due to his lost wages. Under these circumstances, an award of damages based upon lost earnings would not be tantamount to double recovery.

Finally, we consider plaintiff's contention on his cross-appeal that he should be awarded a new trial on the issue of punitive damages. Plaintiff first asserts that the trial judge committed prejudicial error in excluding evidence of additional promises made by defendant and

Harold as to plaintiff's job security because the evidence was relevant to the issue of punitive damages. Plaintiff has waived this argument by failing to object on this basis in the circuit court.

■■■ Plaintiff also contends that the trial judge committed prejudicial error in submitting the punitive damages instruction tendered by defendant, which included the requirement of "actual malice," defined as "a positive desire and intention to injure," instead of his tendered instruction which included "wantonness *** oppression and circumstances of aggravation." The case cited by plaintiff in support of his assertion, *Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 534, 444 N.E.2d 579, 587, involves different factual circumstances and did not address the appropriate instruction to be tendered in this regard. We hold that plaintiff was not prejudiced by the tendered instruction.

In summary, on defendant's appeal from the jury verdict entered against him in plaintiff's intentional interference action, defendant has failed to demonstrate that he is entitled to a judgment notwithstanding the verdict or that he is entitled to a new trial as a result of prejudicial trial errors. On plaintiff's cross-appeal, plaintiff has not advanced any trial errors which would entitle him to a new trial on the issue of punitive damages. Accordingly, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.