Luke DALLIS, Plaintiff–Appellee,
Cross–Appellant,

v.

DON CUNNINGHAM AND ASSOCIATES
and Don Cunningham, individually, De-
fendants–Appellants, Cross–Appellees.

Nos. 92–4021, 92–4091.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1993.

Decided Dec. 8, 1993.

Rehearing Denied Dec. 8, 1993.

**HARLINGTON WOOD, Jr.,** Senior Circuit Judge.

Luke Dallis ("Dallis") brought a breach of contract action against his former employer, Don Cunningham and Associates ("DCA"), seeking payment of sales commissions he allegedly earned while employed as a sales representative. He also sued Don Cunningham ("Cunningham") individually for tortiously inducing DCA to breach its employment contract with Dallis.[1] After a four-day trial, a jury found in favor of Dallis on both counts and awarded compensatory damages of $73,271. Both defendants were to be jointly and severally liable. In addition, the jury found Cunningham individually liable for $13,000 in punitive damages. The district court entered judgment consistent with that verdict and granted plaintiff's motion for prejudgment interest on the compensatory amount. The defendants appealed the jury's verdict. The plaintiff filed a cross-appeal contesting the amount of the interest award.

## I.

## BACKGROUND

DCA is an Illinois corporation that represents manufacturers of sporting goods equipment. It employs a team of independent sales representatives who procure orders for the manufacturers' goods. In exchange for this service, the manufacturers pay DCA a commission which DCA then shares with the representative who obtained the orders.

Luke Dallis, a resident of the State of Michigan, began working as a sales representative for DCA's predecessor, Cunningham, Donaldson & Associates, in 1983. In June of 1988, Don Cunningham bought out his partner, Dave Donaldson, and assumed full control of the business, which then became known as Don Cunningham & Associates ("DCA"). Dallis continued to work for DCA from that date until April 15, 1989, when he voluntarily terminated his employment. As a sales representative, Dallis was responsible for securing sales orders from customers,

Lawrence B. Finn (argued) and Edward J. McCambridge, Segal, McCambridge, Singer & Mahoney, Chicago, IL, for Luke Dallis, plaintiff.

Paul F. Michel (argued), Elliott & McClure, Bourbonnaris, IL, Roger C. Elliott, Anthony G. Argeros, Elliott & McClure, Momence, IL, and Nicholas J. Motherway, Motherway & Glenn, Chicago, IL, for Don Cunningham & Associates, Defendants and Don Cunningham, individually, defendant.

Before BAUER and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

1. DCA brought a counterclaim against Dallis for tortious interference with a different contract. At trial the jury ruled in favor of Dallis on this point and that judgment is not at issue· in this appeal.

excluding K–Mart and Sears, in the state of Michigan.

Throughout the six-year period of his employment, Dallis successfully obtained orders for the products of the manufacturers that DCA and its predecessor represented in this territory. The manufacturers paid commissions to DCA for these orders. Ordinarily, however, the manufacturers would not pay DCA until the order was shipped or until the manufacturer received payment from the customer. Therefore, there was often a lengthy delay between the time the customers placed the orders with the sales representatives and the time that DCA received its commissions.

Although no oral or written employment agreement existed between the parties, DCA consistently paid Dallis 50% of the commissions it received from the manufacturers on behalf of his orders. Dallis received credit for earning these commissions as of the date that DCA received payment from the manufacturers. As noted above the date of this credit would often be several months after Dallis obtained the orders. Nevertheless, DCA always paid Dallis the commissions he earned, despite this delay.

When Dallis terminated his employment on April 15, 1989, he still had outstanding orders for which he had not yet received commissions. When the various manufacturers ultimately remitted these commissions to DCA, it did not pay the customary 50% share to Dallis. Rather, it insisted that its policy was to pay these commissions to the sales representative who was employed in that territory at the time the commissions arrived.

Dallis subsequently filed this diversity [2] suit against DCA alleging that he was entitled to these commissions based on an implied-in-fact contract theory. He alleged that the course of dealing between the two parties evidenced an agreement that Dallis would be paid 50% of the commissions that DCA received for Dallis' orders. In addition, he sued Don Cunningham individually for tortiously inducing DCA to breach its agreement with Dallis. For the 10 month period prior to Dallis' departure, Cunningham was the President and sole shareholder of DCA. In this capacity, Cunningham had ultimate control over all of DCA's operations.

A jury found both defendants jointly and severally liable for $73,271 in compensatory damages and also found Cunningham individually liable for $13,000 in punitive damages. The district court entered judgment on that verdict and also awarded plaintiff pre-judgment interest on the compensatory amount at the rate of 5% annually for a period of six months. The defendants appeal the verdict, claiming there was insufficient evidence to support it. The plaintiff filed a cross-appeal contending that he was entitled to an amount of interest greater than what the court awarded.

## II.

## ANALYSIS

### A. Evidentiary Basis For The Verdict

The first issue we need to address is the standard of review. The appellants are asking this court to review and reverse a jury verdict. When examining the propriety of a jury verdict we ask only if it had "a reasonable basis in the record...." *Goetz v. Cappelen,* 946 F.2d 511, 516 (7th Cir.1991). For if there is any reasonable basis, we must let the jury verdict stand. *Id.*

### 1. Implied–In–Fact Contract

In his first Count, Dallis proceeded to trial with an argument that the conduct of the parties established the existence of an implied-in-fact contract. He argued that under the terms of this "contract" DCA was to pay Dallis 50% of the commissions that it received on behalf of Dallis' orders at the time those commissions arrived from the manufacturer. The jury found in Dallis' favor on this issue and we must now consider whether there was a reasonable basis in the evidence for that verdict.

The law in this area is clearly established and uncontested by the parties.

> An implied[-in-fact] contract is proven by circumstances showing that the parties intended to contract or by circumstances showing the general course of dealing between the parties. An agreement may be said to be implied when it is inferred from the acts or conduct of the parties....

*In re Estate of Brumshagen*, 27 Ill.App.2d 14, 23, 169 N.E.2d 112, 117 (2nd Dist.1960). The evidence regarding the conduct and course of dealing between the parties here is unequivocal and more than sufficiently presents a reasonable basis upon which the jury could have concluded that an implied-in-fact contract existed.

For nearly six years Mr. Dallis worked as an independent sales representative for DCA and its predecessor, Cunningham–Donaldson. During this entire period, his duties remained roughly the same; he would procure sales orders in the state of Michigan for the products of the manufacturers that DCA represented. Without variance, at the time the manufacturers paid commissions to DCA for orders that Dallis had secured, DCA credited Dallis with having earned these commissions and paid him a percentage share. They did this despite the often lengthy delay between the time the order was placed and the time the commissions arrived. When Dallis terminated his employment on April 15, 1989, he had obtained a significant number of orders for which the manufacturers had not yet remitted commissions. The manufacturers ultimately paid these commissions to DCA after Dallis had left; however, DCA never paid Dallis his 50% share.

■ The jury found, based on the unwavering course of dealing and conduct between the parties during the time of Dallis' employment, that an implied-in-fact contract existed whereby Dallis was entitled to his share of the commissions for those outstanding orders. The defendants attempt to confuse the issue by arguing that the relevant course of dealing is not what transpired between the parties while Dallis was employed, but what transpired after the termination. In essence they argue that if DCA had made a practice of paying Dallis commissions after his termi-nation, then Dallis would be entitled to receive further payment of these "post-termination" commissions. This argument is wholly illogical as it begs the question at hand; Dallis is entitled to receive a share of the commissions that came in after his termination only if, argue the defendants, he has already been paid those commissions. We find this argument to be without merit. The issue in the case is whether Dallis has a right to receive commissions for the orders he procured, much the way he had received them in the past. The relevant time period for examining the course of dealing is the entire duration of the Dallis/Cunningham relationship; it is not limited to post-termination activities. Therefore, the jury's verdict, which was based on evidence of the conduct between the parties through this entire period, was perfectly reasonable.

Defendants also argued that the "post-termination" commissions rightfully belong to the new sales representatives who take over in the territory. The only evidence supporting this contention was Cunningham's own testimony that Dallis received outstanding commissions at the time he began working for the organization and that after Dallis quit, DCA paid Dallis' commissions to a new sales representative. The jury, as the finder of fact, was entitled to weigh the credibility of these self-serving statements and this court will not upset that determination on appeal. *Knapp v. Whitaker*, 757 F.2d 827, 843 (7th Cir.1985), *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) (The credibility of the witnesses and the weight of the evidence are matters within the purview of the jury....").

Notwithstanding the defendants' arguments, we see no reason to reverse the jury's verdict. Conduct and a course of dealing between the parties as consistent as that involved in the present case is sufficient to present a reasonable basis for the jury's conclusion that an implied-in-fact contract existed and that the defendants have breached it.

## 2. Tortious Interference With Contract

The plaintiff's second claim alleged that Don Cunningham should be individually lia-

ble for interfering with the implied-in-fact contract because he intentionally caused DCA to withhold the commissions Dallis had earned. In Illinois the elements of tortious interference with contract are as follows: 1) a valid and enforceable contract; 2) defendant's awareness of the contractual relationship; 3) defendant's intentional and unjustified inducement of a breach of the contract; 4) subsequent breach by the third party caused by the defendant's wrongful conduct; and 5) damages resulting from the breach. *Prince v. Zazove,* 959 F.2d 1395, 1397 (7th Cir.1992). Dallis presented evidence regarding all of these elements and the jury returned a verdict in his favor.

Cunningham asserts two claims that he believes justify a reversal of the jury verdict on this count. First, he argues that there was not a sufficient basis in the evidence to support a finding that a contract existed, or that he was aware of its existence. In the alternative, Cunningham argues that he was privileged to act as he did. We reject both of these arguments and affirm the jury verdict.

### a. Existence and Awareness of the Contractual Relationship

■ As we discussed above, there was sufficient evidence for the jury to conclude that a valid contract existed. Because no one contests the fact that Dallis never received his commissions, there was clearly a breach of the contract. The defendants' only remaining argument on this point is that Cunningham was a "lay person" and was not aware of the contractual relationship. In light of the evidence presented at trial, this argument must fail.

Although Cunningham was not an attorney, the jury viewed enough evidence to find that, as an experienced businessman, he was aware of the course of dealing and conduct that formed the basis of the contractual relationship. He did not need to be a lawyer to have this awareness. Cunningham was, for several years, a partner in the organization that employed and paid Dallis. Furthermore, from June of 1988 until Dallis resigned, he controlled all of the operations of DCA. This alone was sufficient evidence to

conclude that Cunningham was familiar with the manner by which Dallis obtained orders and received commissions. Because these acts formed the terms of the contractual relationship, it was perfectly logical, and supported by ample evidence, for the jury to find that Cunningham was aware of this relationship.

Additionally, Cunningham and Dallis had conversations in which Cunningham clearly expressed his knowledge of the obligation to pay Dallis. According to Cunningham's testimony, sometime between March 27 and April 15, 1989, Dallis inquired "whether he was going to get paid for what he had coming." (Tr. 78) Although there was no evidence of Cunningham's response, the parties had another conversation shortly after Dallis left the company. Dallis testified that during this conversation he told Cunningham he "expect[ed] to be paid [his] commissions." (Tr. 168) Cunningham responded by telling Dallis "not to worry about that, no problem." (Tr. 168) No evidence in the record contradicts these statements. Based upon this testimony and Cunningham's close involvement with the organization, the jury could reasonably conclude that Cunningham was aware of the contractual relationship.

### b. Corporate Officer's Privilege

■ Cunningham next asserts that he was privileged to act as he did. In Illinois, corporate officers are privileged to influence the actions of their corporations if they act "for a proper business purpose and in good faith...." *Mittelman v. Witous,* 135 Ill.2d 220, 249, 142 Ill.Dec. 232, 246, 552 N.E.2d 973, 987 (1989). Cunningham believes that this rule should insulate him from any liability in connection with this case. This privilege, however, is a qualified one. It does not protect officers who "act *solely* for their own gain or *solely* for the purpose of harming [the] plaintiff since such conduct is not undertaken to further the corporation's interest." *Id.*

Dallis argued at trial that Cunningham interfered with the implied contract solely for his own financial gain. Dallis presented evidence to this effect. This evidence showed that throughout the period of June 1988

through the date of trial, Don Cunningham controlled DCA and decided when and if it was to pay bonuses. During the 1988–89 season (March 31, 1988–March 31, 1989) DCA had gross revenues of $1,051,923. It paid its representatives commissions of $400,-797 (38% of gross revenues) and Cunningham received compensation of $108,000 (10% of gross revenues). The next year (March 31, 1989–March 31, 1990) DCA's gross revenues dropped to $444,463 (42% of the previous year). The representatives' commissions also dropped, to $83,876 (19% of gross revenues). Cunningham's own compensation, however, skyrocketed. He received a combined salary and bonus of $184,667 (170% of previous year; 42% of gross revenues).

The second year is the time period in which Dallis claimed that DCA withheld his commissions. In that same year, however, although the gross revenues were cut in half, Cunningham saw his compensation nearly double, while the representatives saw their pay decrease dramatically. Based on this evidence, the jury could have reasonably concluded that Cunningham caused DCA not to pay Dallis his commissions solely to further his personal financial interest. Therefore the conclusion that Cunningham is not protected by the qualified privilege had a reasonable basis in the evidence and we will not reverse that finding.

### B. Pre–Judgment Interest

■ On September 3, 1992, the district court entered judgment in favor of Dallis for $73,721. This amount reflects the commissions, attributable to Dallis' orders, that DCA received on various dates after Dallis terminated his employment. After the court entered judgment in his favor, Dallis filed a motion for pre-judgment interest pursuant to Ill.Rev.Stat. ch. 17 ¶ 6402.[3] This Illinois statute allows creditors to receive interest of five percent annually "for all moneys after they become due on ... the settlement of account from the day of liquidating accounts between parties and ascertaining the balance...."

The general rule under this section is that "litigants are entitled to pre[-]judgment interest if the damages are liquidated and capable of easy calculation." *Stanley Gudyka Sales Co. v. Lacy Forest Products Co.*, 915 F.2d 273, 279 (7th Cir.1990). Based on this, Dallis argued that he was entitled to five percent, annually, from the dates the various amounts reached DCA (1989–1992) until the date of the judgment. Alternatively he argued that he was entitled to interest beginning on March 30, 1992, the date the parties signed an agreement stipulating the amount in dispute.[4] The district court judge allowed an award of interest from the latter date. Making an award of pre-judgment interest is a matter within the trial judge's discretion. *Emmenegger Constr. Co. v. King*, 103 Ill. App.3d 423, 429, 59 Ill.Dec. 237, 242, 431 N.E.2d 738, 743 (5th Dist.1982). Dallis appeals claiming the judge abused his discretion by not accruing the interest from the dates DCA received the commissions. The defendants argue that no pre-judgment interest was proper at all.

### 1. The Amount of the Claim Was Not Liquidated on the Dates DCA Received the Commissions

■ Dallis argues that the damages were liquidated and capable of easy calculation as of the various dates the commissions reached DCA. He directs our attention to Joint Exhibit # 7, a computer printout of various Dallis accounts, dates of orders, as well as the dollar amounts of the commissions that DCA received and the dates it received them. Dallis suggests that one easily can calculate the interest he deserves by examining each entry to determine if the order was placed before 4/15/89; if it was, and if DCA received the commissions after that date, then Dallis argues he is entitled to 50% of the amount listed.

The district court found that although this method might be preferable, the interest owing under this approach is not easily calculable or liquidated. We find that the trial

---

3. This section is now codified under 815 ILCS 205/2 and we will refer to it by this citation.

4. The parties stipulated that if DCA was obligated to pay commissions to Dallis, based on any contract theory, the amount Dallis would be entitled to would be $73,720.21.

judge did not abuse his discretion in this regard. The exhibit Dallis refers to is roughly 30 pages in length. Each page contains up to 30 specific entries for various accounts. Therefore one would be required to examine approximately 900 entries and calculate the interest owing for each individual entry. Furthermore, many of the entries are supplemented with notations, some of which are comprehensible, others are virtually cryptic. "[I]f judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated." *First Nat'l Bank Co. of Clinton, Ill. v. Insurance Co. of North America,* 606 F.2d 760, 770 (7th Cir.1979). In this case mere computation is not sufficient to determine the correct amount of commissions; rather, the person making the computations would require the judgment and consultation of someone more familiar with the meaning and effect of the various notations. Therefore the claim was not liquidated as of the dates of receipt.

## 2. The Amount of the Claim Was Liquidated on the Date of the Stipulation

■ On March 30, 1992, the parties stipulated that in the event of a finding that DCA had breached a contract, the amount of damages would be $73,720.21.[5] The district court concluded that damages were liquidated as of that date and awarded pre-judgment interest accordingly.[6] The defendants argue that the stipulation in this case was not intended as a liquidation of damages but a maximum amount the jury could consider awarding. They claim that the jury had a wide range of discretion in awarding damages, which discretion precludes a finding that the amount of the claim was liquidated. *First Nat'l*

5. The amount of the judgment was $73,721, which apparently reflected a small degree of rounding up from the stipulated amount. This difference will not affect the analysis of this opinion.

6. The district court based its conclusion in part on *Neal—Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7th Cir.1974), which held that a stipulation agreement was a "settlement of account" for the purposes of the Illinois statute (815 ILCS 205/2). *Id.* at 297.

*Bank,* 606 F.2d at 770. In light of the record in this case, the defendants' arguments fail.

During the jury instruction conference, the district court judge and the attorneys for both parties discussed and explained the level of discretion the jury would have in awarding damages on Counts I and II. Count I was the breach of contract action against DCA. Addressing the parties' attorneys on this Count, the judge said "you have agreed on how much [Dallis] is due if there is a contract and Cunningham breached it." (Tr. 463). Later the judge reemphasized this by saying that "the jury knows what the agreed commission is [on count I].... And I think under Count I you both agree that if the jury finds a contract, the $73,000 is the [award of damages]." (Tr. 465–66). Based on these statements the jury obviously had no discretion regarding the amount of the claim on Count I, against DCA; they were bound to award the amount stipulated. On these facts, we believe the that the district court acted well within its discretion by concluding that the stipulation of March 30, 1992 was equivalent to a "settlement of account" for purposes of the Illinois statute (805 ILCS 205/2) and that the claim was liquidated as of that date.[7] We therefore affirm the award of pre-judgment interest.

With respect to Count II, against Don Cunningham individually, the court made clear that "the jury could award less than the 73,000 ... and not accept [the parties'] stipulation...." (Tr. 464).[8] Therefore, the amount of the claim on this count, against Cunningham individually, was subject to discretion and judgment by the jury and could not be liquidated. Because the stipulation was not a liquidation of the claim against Cunningham individually on Count II, we interpret the district court's ruling to mean

7. This court has previously stated that "the essence of a settlement of account is an agreed determination of the amount of a liability." *Neal—Cooper,* 508 F.2d at 296. The parties in the present case had agreed to the amount of damages.

8. In fact, the stipulation agreement made no reference to Count II whatsoever.

that only DCA, the Count I defendant, will be liable for the appropriate amount of pre-judgment interest.

### III.

### Conclusion

Upon reviewing the record in this case, we conclude that there was a reasonable basis in the evidence for the jury verdict that DCA breached an implied-in-fact contract as well as the verdict that Don Cunningham intentionally interfered with that contract. Furthermore, there was sufficient evidence for the jury to conclude that Cunningham was acting solely to further his personal financial interests and therefore the qualified privilege of a corporate officer did not protect him from liability on the tortious interference claim. Finally, we hold that Dallis should receive pre-judgment interest at the rate of five percent from the date of the stipulation until the date of the judgment as against DCA only; Cunningham will not be liable for any interest award.

AFFIRMED.