Henry H. STAFFORD, Jr.,
Plaintiff–Appellee,

v.

Louis PURO, Robert D. Levin and Seena Puro, Co–Executors of the Estate of Arthur Puro, deceased, Defendants–Appellants.

Nos. 94–2611 and 95–1060.

United States Court of Appeals,
Seventh Circuit.

Argued June 9, 1995.

Decided Aug. 24, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 25, 1995.

Raymond H. Groble, III, Ginger Mayer (argued), Bernard Roccanova, Ross & Hardies, Chicago, IL, for plaintiff-appellee.

Marc C. Smith (argued), Paula S. Goldberg, Rosenblum, Vandenberg & Smith, Chicago, IL, for defendants-appellants.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

After being terminated and denied payment of his salary, commissions, and expenses, Henry Stafford filed a multi-count diversity suit against his employer, Purofied Down Products Corporation, two of its owners and officers, Arthur and Louis Puro, and Stafford's supervisor, Kenneth Mesnik. A jury found Arthur and Louis Puro liable for violating the Illinois Wage Payment and Collection Act (the "Wage Act") and for tortiously interfering with the compensation agreement between Stafford and Purofied. The Puros challenge these verdicts, as well as the jury's awards of emotional distress and punitive damages. We affirm in all respects except the award of exemplary damages, for which we order a new trial unless Stafford accepts a remittitur.

## I.

Purofied Down Products Corporation, as its name suggests, manufactured down products. Louis owned 44% of the stock of Purofied, but later transferred his ownership in the corporation to the Louis Puro Family Trust, of which he was Trustee. His brother, Arthur, also owned 44% of Purofied, while another brother, Sam, owned the remaining 12%.

Henry Stafford began working for Purofied in 1979 as its Regional Manager of Midwest Sales and Special Markets. The corporation paid Stafford a yearly salary and a 1% commission on sales he generated. Stafford initially reported directly to Louis, the then Chairman of the Board. Beginning with Kenneth Mesnik's hiring in 1987 as Executive Vice President, Stafford began reporting to Mesnik.

By 1985, Stafford's sales totalled approximately $1.5 million per year. Beginning in 1985, Stafford attempted to establish relationships with several television shopping channels. He eventually landed an account with the Home Shopping Network ("HSN"). As a result of this success, Stafford's sales rose to $1.8 million for the first five months of 1988, with projected sales of $9 million for the entire year. Although only Stafford had previously met with HSN representatives, Mesnik informed Stafford in early 1988 that Mesnik and another Purofied employee planned to meet with them and scheduled the meeting to occur while Stafford was on vacation.

In 1985, Purofied had gone through a Chapter 11 reorganization. By 1988, the corporation seemed to have rebounded and during that year generated sales of $30 million and consistently met its credit obligations. In 1988, Purofied paid $1 million for raw materials to Windsor Trading, a company owned by Arthur, and $200,000 for lease obligations to the Louis Puro Family Trust.

Despite Purofied's performance, Stafford did not receive commissions for his 1987 sales, an amount equal to approximately 25% of his total yearly compensation. He requested payment from Mesnik, who promised Stafford he would receive a check in January, 1988. He did not. Over the next six months, Stafford sent several memoranda to Mesnik seeking payment. Mesnik testified at his deposition, a transcript of which was introduced at trial, that he spoke with the Puros after receiving many of Stafford's memos. Stafford also sent a letter to Louis and one to Arthur, the latter letter specifically mentioning the financial difficulties Purofied's delayed payment was causing Stafford. In response to these memoranda, Mesnik told Stafford that he would receive his money, but again, he did not. On May 3, 1988, Purofied gave Stafford a check for his commissions on first quarter, 1988 sales. Stafford could not cash the check, however, because Arthur and Louis had not signed it, as required for any Purofied draft over $1,000.

On August 1, 1988, Stafford attended a meeting at Purofied's headquarters in New Jersey. Mesnik had once again promised him payment of 1987 and 1988 commissions, as well as reimbursement for past-due travel expenses. As before, Stafford failed to receive a check. After the strategy meeting, to which Stafford had brought all of his background information on HSN as requested, Stafford discussed the account with the Puros and Mesnik. Later in the day, Mesnik congratulated Stafford on his work, toasted his new business, and told him that his checks would be delivered the next day.

Instead of paying Stafford on August 2, Mesnik fired him. Mesnik stated that he and the Puros had agreed on this action, indicating that the memoranda Stafford had written regarding his need for payment had irritated the Puros. Mesnik acknowledged that the company owed Stafford a substantial amount of money and stated that Purofied would pay him his 1987 commissions, travel expenses, and final month's salary if he signed a release relinquishing his right to any other amounts, including those he had earned for completed, 1988 sales. Mesnik possessed checks for the promised amounts, but when Stafford refused to sign the release Mesnik told him that the Puros had instructed Mesnik to refuse to turn them over.

On September 30, 1988, Stafford's attorney sent letters to the Puros and Mesnik, requesting payment of all amounts Purofied

owed his client. After receiving this correspondence, Louis questioned Mesnik about the situation. Mesnik responded that it was being taken care of, but Purofied did not tender payment. Stafford subsequently initiated this lawsuit against Purofied and the Puros. Stafford alleged that Purofied had breached his compensation agreement and converted his commissions, that the Puros had violated the Wage Act, had terminated his employment in bad faith, and had tortiously interfered with his compensation agreement and his business relationship with Purofied, and that the Puros were the alter egos of Purofied. Purofied filed for bankruptcy in 1990, thereby staying the actions against it. Stafford then added Mesnik as a defendant. Arthur died and Stafford substituted the co-executors of his estate, Robert Levin and Seena Puro, as defendants. The district court granted summary judgment for the individual defendants on Stafford's bad faith termination claim and, on May 22, 1992, entered a default judgment against Mesnik, the subject of a separate appeal. *Stafford v. Mesnik*, 63 F.3d 1445 (7th Cir.1995).

The remaining counts went to trial before a Magistrate Judge and a jury. The jury found the Puros liable under the Wage Act and awarded Stafford $67,745. The jury also found that the Puros had tortiously interfered with the compensation agreement between Stafford and Purofied. It awarded Stafford $450,000 in emotional distress damages against Arthur and Louis, and $500,000 in punitive damages against Louis. Finally, the jury concluded that the defendants had not tortiously interfered with Stafford's business relationship with Purofied. The Puros filed a motion for judgment notwithstanding the verdict or a new trial, which the court denied except to the extent that Stafford accepted a remittitur to $100,000 for emotional distress damages. This appeal followed.

## II.

■ Arthur and Louis first argue that the verdict against them for violating the Wage Act cannot stand. Although Illinois law governs the substantive issues in this case, we use a federal standard to test the sufficiency of the evidence. *Mayer v. Gary Partners & Co., Ltd.*, 29 F.3d 330, 335 (7th Cir.1994) ("We now adopt the federal reasonable-person standard across the board: pretrial, mid-trial, post-trial, and on appeal, for evaluating both the merits and quantum of relief."). We review the verdict to determine whether, making all reasonable inferences from the evidence and examining it in the light most favorable to the prevailing party, the evidence supports a finding on each element of the claim. *See, e.g., Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1042 (7th Cir.1994).

■ The Wage Act makes it a Class C misdemeanor for an employer who,

being able to pay wages, final compensation, or wage supplements and being under a duty to pay, wilfully refuses to pay as provided ...

820 ILSC 115/14(a). An employer must pay all amounts owed in full at the time of termination or by its next regular payday. 820 ILCS 115/5. An employee can bring a private cause of action to recover the wages owed to him, 820 ILCS 115/11(c), and can hold corporate officers and agents personally liable by proving that they knowingly permitted the corporation to violate the Wage Act. 820 ILCS 115/13. Louis argues that he had no knowledge of Stafford's compensation arrangement or the amounts due him and thus he did not knowingly permit Purofied to violate the Wage Act.

In *Johnson v. Western Amusement Corp.*, 157 Ill.App.3d 873, 109 Ill.Dec. 923, 510 N.E.2d 991 (1st Dist.1987), the court affirmed a verdict finding the defendant corporation's President, Ross, personally liable for union and trust dues and welfare contributions the corporation had not paid as required by a collective bargaining agreement between itself and the union. Ross had familiarity with the terms of the agreement and had made the required payments in the past, thus evincing his knowledge of the obligation. *Id.* 109 Ill.Dec. at 925, 510 N.E.2d at 993; *see also In re Faber*, 52 B.R. 563, 565–66 (Bkrtcy.N.D.Ill.1985) (Defendant had sufficient knowledge because he understood that amounts were being withheld from employ-

ees' paychecks to pay dues and welfare contributions and knew that the corporation was not making the required payments.). Although Louis testified that he had no idea how Purofied compensated Stafford, the jury could reasonably have given this statement little credence based on Stafford's testimony that he originally reported to Louis and the uncontroverted evidence that Louis routinely signed Stafford's paychecks and knew he received a commission. Moreover, Stafford's memoranda and his attorney's letter to Louis demonstrate Louis's awareness of the corporation's debt to Stafford and its non-payment. After receiving the letter, Louis asked Mesnik about the situation, but took no other action to ensure that Purofied fulfilled its duty to pay Stafford. Although neither Louis nor Arthur individually could disburse a check for over $1,000, together they could. Thus, the jury could have found that Louis knowingly permitted Purofied to violate the Wage Act.

Next, Louis contends that he did not act willfully in that Purofied could not pay Stafford because of the company's financial difficulties. A corporation's inability to pay amounts due negates a finding that it behaved wilfully under the Wage Act. *People v. Chaindrive Corp.,* 49 Ill.App.3d 564, 7 Ill.Dec. 427, 429, 364 N.E.2d 588, 590 (1st Dist.1977). The evidence, however, demonstrates that Purofied paid approximately $1.2 million in 1988 to Puro-related entities, paid its other creditors, and tendered a check to Stafford months before his termination. In addition, Mesnik possessed a check for at least partial payment the day he fired Stafford. This evidence sufficiently establishes that Purofied could have paid Stafford.

Finally, Louis asserts that he did not otherwise act willfully. A voluntary, conscious, and intentional act constitutes willful conduct under the Act. *Johnson,* 109 Ill.Dec. at 925, 510 N.E.2d at 993 (relying on Illinois Supreme Court's definition of willful conduct under the Retailers' Occupational Tax Act). In *Johnson,* Ross's knowledge of the corporation's obligation and failure to pay it when having sufficient amounts available to do so constituted willful behavior. *Id.* Louis also knew of Purofied's obligation and, as Stafford

testified, ordered Mesnik to refuse to pay any of it unless Stafford signed a release relinquishing his right to certain amounts. This constitutes a voluntary, intentional act, conduct that the Wage Act specifically prohibits. 820 ILCS 115/9 ("[A]ny release or restrictive endorsement required by an employer as a condition to payment shall be a violation of this Act and shall be void."). Although Louis argues that Stafford's testimony regarding Mesnik's statement by itself cannot suffice, we do not reweigh the jury's credibility determinations. *See Dallis v. Don Cunningham & Assoc.,* 11 F.3d 713, 716 (7th Cir.1993). Louis's insistence on a release and Purofied's continual refusal to pay Stafford support a finding that Louis acted willfully.

## III.

The Puros next challenge the verdict against them for tortiously interfering with Stafford's compensation agreement. Illinois has long recognized this cause of action. *See, e.g., Swager v. Couri,* 77 Ill.2d 173, 32 Ill.Dec. 540, 545, 395 N.E.2d 921, 926 (1979); *Worrick v. Flora,* 133 Ill.App.2d 755, 272 N.E.2d 708, 710 (1st Dist.1971). This claim requires proof of a legally enforceable contract, the defendant's knowledge of that contract, the defendant's intentional interference inducing a breach by a party to the contract, and damages. *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 171 (7th Cir. 1993); *Chapman v. Crown Glass Corp.,* 197 Ill.App.3d 995, 1005, 145 Ill.Dec. 486, 492, 557 N.E.2d 256, 262 (1st Dist.1990). The Puros first argue that they could not have tortiously interfered with Stafford's compensation agreement because they themselves were parties to that contract. *See Worrick,* 272 N.E.2d at 711 (claim will not lie against a party to the contract). They rely on *Rao v. Rao,* 718 F.2d 219, 225 (7th Cir.1983), in which this court held that the sole shareholder and officer of a corporation was a party to the contract between the plaintiff and the corporation, and thus could not have tortiously interfered with the agreement, because the corporation could not act without the shareholder's involvement. The Puros argue that because they owned the majority of

Purofied and were directors and officers, they are likewise not liable. We disagree.

In *Rao*, we emphasized the fact that the corporation did not exist but for the individual defendant—he owned all of the stock and ran it singlehandedly. *Id.* Arthur owned 44% of Purofied, and while Louis personally owned none, the Louis Puro Family Trust, which he controlled, held an equivalent stake in the company. Sam Puro owned the remainder, a significant portion, of Purofied stock. As officers and directors, Louis and Arthur thus had duties to persons other than themselves, unlike the defendant in *Rao*. Moreover, Illinois courts have addressed many tortious interference claims brought against corporate shareholders, officers, and directors without ever finding that they were parties to the contract at issue. *See H.F. Philipsborn & Co. v. Suson,* 59 Ill.2d 465, 322 N.E.2d 45 (1974) (sole shareholder and director); *Chapman,* 145 Ill.Dec. at 486, 557 N.E.2d at 256 (half-owner and President); *Worrick,* 272 N.E.2d at 708 (principal shareholder and director). Illinois does not treat closely-held corporation shareholders and officers differently from those of large, public corporations, and we cannot do otherwise here.

A corporation can operate only through its officers and directors, however, and those agents must have the ability to exercise their business judgment without fear of personal liability. Illinois therefore grants corporate officers and directors a conditional privilege that protects them from personal liability for their decisions made on behalf of the corporation. *Swager,* 32 Ill. Dec. at 546–47, 395 N.E.2d at 927–28. When conduct is privileged, the plaintiff must prove actual malice on the defendant's part to prevail on a tortious interference claim. Malice, "in the context of interference with contractual relations cases, simply means that the interference must have been intentional and unjustified." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 24, 545 N.E.2d 672, 677 (1989). Directors and officers are not justified in acting solely for their own benefit or solely in order to injure the plaintiff because such conduct is contrary to the best interests of the corporation. *HPI Health Care,* 137 Ill. Dec. at 25, 545 N.E.2d at 678; *see also George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d 1326, 1333 (7th Cir.1983). Privileged actors are also "unjustified in using illegal means to induce a breach of contract." *HPI Health Care,* 137 Ill.Dec. at 25, 545 N.E.2d at 678 (citing *Prudential Insurance Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 568, 511 N.E.2d 740, 745 (5th Dist.), *appeal denied,* 117 Ill.2d 553, 115 Ill.Dec. 409, 517 N.E.2d 1095 (1987)).

Although the Puros assert that they did not lose their privilege, the evidence supports the conclusion that the Puros acted without justification. Their conduct clearly violated the Wage Act, thereby making it illegal. *See Prudential,* 110 Ill.Dec. at 568, 511 N.E.2d at 745 ("We agree that '[c]onduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper.'") (citing Restatement (Second) of Torts § 767, comment c at 31 (1979)). The Puros argue, without legal support, that a finding of liability under the Wage Act cannot also constitute a tort, but the Illinois Supreme Court has apparently concluded otherwise, at least where the plaintiff is among the class the statute was designed to protect, as is Stafford. *HPI Health Care,* 137 Ill.Dec. at 25, 545 N.E.2d at 678; *Prudential,* 110 Ill.Dec. at 568, 511 N.E.2d at 745. In *HPI Health Care,* the court, in dismissing a tortious interference claim for failure to state sufficient facts to support an allegation of actual malice, noted: "There are no allegations that [the defendants'] decisions not to pay [the plaintiff] *were illegal,* contrary to the interests of [the hospital whose finances the defendants managed], motivated by a desire for personal gain, or intended to harm [the plaintiff]." 137 Ill.Dec. at 25, 545 N.E.2d at 678 (emphasis added). Here, the Puros' refusal to pay Stafford was unlawful and we therefore uphold the verdict against them.[1]

---

1. Louis Puro maintains that Stafford presented no evidence proving that Puro had anything to

## IV.

Louis and Arthur next contend that the evidence does not support either the award of punitive or emotional distress damages. They argue that such damages are not recoverable for what amounts to a simple breach of contract, that the award of punitive damages is excessive, that Stafford presented insufficient evidence to support a grant of emotional distress damages, and that the interference with Stafford's compensation agreement did not cause those damages.

■■■■ Illinois does not allow punitive and emotional distress damages for breaches of contract, *see Morrow v. L.A. Goldschmidt*, 112 Ill.2d 87, 96 Ill.Dec. 939, 941–42, 492 N.E.2d 181, 183–84 (1986) (must prove an independent tort to recover exemplary damages); *Maere v. Churchill*, 116 Ill.App.3d 939, 72 Ill.Dec. 441, 444, 452 N.E.2d 694, 697 (3d Dist.1983) ("[D]amages for breach will not be given as compensation for mental suffering except where the breach was wanton or reckless and caused bodily harm, or where defendant had reason to know, when the contract was made, that its breach would cause more than mere pecuniary loss."). Stafford, however, alleged, and proved, that the Puros tortiously interfered with the compensation agreement between Purofied and him, not that they themselves had breached that pact. Because Arthur and Louis and Purofied are not the same parties, Stafford's claim does not boil down to a breach of contract and upon proper proof, the jury could award Stafford punitive and emotional distress damages.

■■■■ Louis, against whom the jury awarded exemplary damages, argues that Stafford did not present sufficient proof of outrageous conduct as required by our decision in *Europlast Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1276 (7th Cir.1993). We review the appropriateness of the submission of these damages to the jury *de novo*. *Id.* Punitive damages are recoverable when "torts are committed with fraud, actual malice, deliberate violence or oppression, or

when the defendant acts willfully, or with gross negligence as to indicate a wanton disregard for the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 566, 384 N.E.2d 353, 360 (1978); *see also Europlast*, 10 F.3d at 1276. The court instructed the jury in accordance with these cases.

Stafford asserts that Illinois requires a less stringent showing of actual malice to recover exemplary damages for this cause of action. In *Smith–Shrader Co., Inc. v. Smith*, 136 Ill.App.3d 571, 91 Ill.Dec. 1, 8, 483 N.E.2d 283, 290 (1st Dist.1985), the court noted that in the tortious interference context actual malice means "that the defendant acted intentionally and without just cause." Such conduct clearly supports a finding of liability against a privileged actor, *HPI Health Care*, 137 Ill.Dec. at 24, 545 N.E.2d at 677, but the *Smith–Shrader* court held that it also justifies an award of punitive damages. 91 Ill. Dec. at 8, 483 N.E.2d at 290; *see also Hill v. Names & Addresses, Inc.*, 212 Ill.App.3d 1065, 157 Ill.Dec. 66, 79, 571 N.E.2d 1085, 1098 (1st Dist.1991) (applying *Smith–Shrader*). The Illinois Supreme Court has not adopted this lesser standard and uniformly has required some kind of outrageous behavior for a recovery of punitive damages, something not necessarily presented by unjustified conduct. It is an open question whether *Smith–Shrader* accurately reflects Illinois law. We need not decide that question because we can uphold the jury's award even using *Kelsay* and *Europlast*'s more stringent standards.

Here, the evidence demonstrated that Louis knew of Purofied's obligation to Stafford long before receiving the letter from Stafford's attorney. Mesnik testified that he informed Louis of Stafford's memoranda throughout 1988 and Stafford himself sent one to Louis months before his termination. The jury reasonably could infer that Louis would have realized that such prolonged nonpayment would cause serious financial difficulties for his employee. At termination,

do with the decision not to pay Stafford. We have already rejected that contention under the Wage Act claim. Once again, although much of Stafford's case depended on his own testimony,

we will not overturn the jury's decision to credit his story over Puro's account. *Dallis*, 11 F.3d at 716. Puro does not contest any other elements of the claim.

rather than pay Stafford the amounts undisputedly owed him and contest the remaining sums, Louis directed Mesnik to coerce Stafford into relinquishing his rights in order to receive anything. Louis presented no reason for this behavior other than the avoidance of a future lawsuit, conduct that seems in gross disregard of Stafford's rights since he would not, by signing the release, obtain anything more than what Purofied undoubtedly owed him. Illinois courts have upheld the award of exemplary damages in the face of coercive behavior. *See Cox v. Doctor's Assoc., Inc.,* 245 Ill.App.3d 186, 184 Ill.Dec. 714, 737, 613 N.E.2d 1306, 1329 (5th Dist.), *appeal denied,* 152 Ill.2d 556, 190 Ill.Dec. 885, 622 N.E.2d 1202 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1069, 127 L.Ed.2d 388 (1994); *see also Embassy/Main Auto Leasing Co. v. C.A.R. Leasing, Inc.,* 155 Ill.App.3d 427, 108 Ill.Dec. 170, 174, 508 N.E.2d 331, 335 (1st Dist.); *appeal denied,* 116 Ill.2d 553, 113 Ill.Dec. 297, 515 N.E.2d 106 (1987). That conduct, combined with Louis's seemingly incredible indifference to the long delay in payment, persuades us that the court properly presented the issue to the jury.

 Louis argues that even if punitive damages were properly awarded, $500,000 is a clearly excessive amount. We review the court's decision to uphold the size of a damage award for an abuse of discretion. *E.E.O.C. v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1287 (7th Cir.1995). In determining the appropriateness of the amount of exemplary damages awarded, Illinois courts look to three factors: "(1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple claims." *Cash v. Beltmann North American Co., Inc.,* 900 F.2d 109, 111 (7th Cir.1990) (citing *Hazelwood v. Illinois Cent. Gulf R.R.,* 114 Ill.App.3d 703, 71 Ill. Dec. 320, 328–29, 450 N.E.2d 1199, 1207–08 (4th Dist.1983)). These factors are not exclusive, however, and courts must analyze the specific circumstances of each case. *Ross v. Black & Decker,* 977 F.2d 1178, 1189 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993). We will reduce an award if it exceeds what is necessary to fulfill the aims of exemplary damages: punishment and deterrence. *AIC Security,* 55 F.3d at 1287.

Louis has not suggested that any possibility exists for multiple recoveries against him. Regarding his financial status, Louis argues that he personally has no assets: only his wife and the Louis Puro Family Trust do. He maintains that we cannot consider him the owner of those assets for damages purposes and also consistently find that he does not own Purofied for tortious interference purposes. While in finding that Louis was not a party to Stafford's compensation agreement we noted that Louis did not personally own part of Purofied, we did not rely on that fact. In the absence of any compelling argument to the contrary, and in light of Louis's testimony that his wife obtained her assets primarily through gifts from him, we believe that the jury could base its award on these related assets. However, the $500,000 award seems to comprise an unusually large percentage of his net worth. *See Cash,* 900 F.2d at 111 n. 3 (noting that most awards equal approximately 1% of defendants' net worth); *Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 873 F.Supp. 1124, 1143 (N.D.Ill.1995).

Moreover, we believe that the jury may have set the award based on the fact that Stafford lost his job, supposedly so Arthur and Louis could retain his future commissions. In upholding the damages, the court stated: "While the court is in agreement that the amount awarded is high given the nature of this case, there was evidence from which the jury could conclude that this defendant acted willfully to deprive plaintiff of his share of the fruits of the business plaintiff had worked long and hard to develop." The jury found for the defendants on Stafford's claim for tortious interference with his business relationship, the conduct that primarily deprived Stafford of these future rewards. By focussing on this aspect of Louis's behavior, the court relied on the nature and enormity of the wrong wrong. In doing so, the able Magistrate Judge, who apparently would have otherwise reduced the award, abused its discretion. Our conclusion that the court, and presumably the jury, relied on impermissible considerations is buttressed by the fact that the court reduced the emotional distress

damages. *See AIC Security,* 55 F.3d at 1287 n. 17; *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1314 (7th Cir.1985). We therefore vacate the punitive damages award and remand for a new trial on this issue unless the plaintiff accepts a remittitur to $250,000, an amount we believe adequately punishes and deters such conduct. *Cash,* 900 F.2d at 112 (appellate court has the same power as a trial court to order a remittitur).

 Finally, Arthur and Louis maintain that Stafford should not receive any damages for his alleged emotional distress because the evidence did not support such damages and the tortious interference with Stafford's compensation agreement did not cause them. At trial, Stafford testified that he became "emotionally stressed out" after his August 2 meeting with Mesnik. Far from presenting only this conclusory statement, however, Stafford detailed the financial problems he encountered as well as physical manifestations of his stress arising from those problems. He stated that he could not pay his credit card bills, thereby ruining his credit rating. Stafford had to use all of his life savings to meet living expenses and eventually lost his home after taking out a second mortgage on it. These financial difficulties caused Stafford to develop high blood pressure and a spastic colon, problems for which he sought medical attention. Stafford did not state simply that the Puros' behavior humiliated him or caused him stress. *See United States v. Balistrieri,* 981 F.2d 916, 931–32 (7th Cir.1992) (a party's own statements can support a mental suffering award if they are more than simply conclusory), *cert. denied,* —— U.S. ——, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993); *Nekolny v. Painter,* 653 F.2d 1164, 1172 (7th Cir.1981) (reversing emotional distress damages when supported simply by plaintiffs' statements they were depressed and humiliated), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Rather, Stafford presented unrebutted testimony regarding the effects of the Puros' conduct, evidence that adequately demonstrates his entitlement to damages.

Moreover, contrary to the Puros' assertion, the evidence supports a finding that the refusal to compensate Stafford, in addition to his termination, caused his mental and physical suffering. Stafford stated at trial that after the meeting he "was extremely upset ... to have it so abruptly happen ... after ten years." While this undoubtedly refers to being fired, Mesnik also refused to pay Stafford the amounts Purofied unquestionably owed him at that meeting, a continuing refusal that had been causing Stafford financial difficulties for months. The jury reasonably could have concluded that Stafford's financial and medical problems would have been relieved, at least partially, had Purofied paid him as required by law and could compensate him accordingly. Any improper reliance by the jury on Stafford's termination was adequately rectified, we believe, by the court's order and Stafford's acceptance of a remittitur.

For the foregoing reasons, we AFFIRM the decision of the court but VACATE the award of exemplary damages and REMAND for a new trial on that issue unless Stafford accepts a remittitur to $250,000.