In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3557

TABFG, LLC,

*Plaintiff-Appellee,*

*v.*

RICHARD PFEIL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:08-cv-06979 — **Robert W. Gettleman**, *Judge.*

ARGUED APRIL 15, 2013 — DECIDED MARCH 20, 2014

Before RIPPLE, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* TABFG, a limited liability corpora-
tion, brought suit against Richard Pfeil alleging, among other
claims, tortious interference with a contract. After a bench trial,
the district court entered judgment in favor of TABFG, and
awarded a judgment in the amount of $957,659.68, comprised
of a principal amount of $674,121.87 plus prejudgment interest

2                                                        No. 12-3557

of $279,530.36 and costs of $4,007.45. Pfeil now appeals that determination, and we affirm.

In April 2003, a joint venture was formed between two limited liability companies, TABFG and NT Prop Trading ("NT Prop"), for the purpose of trading securities for financial gain. TABFG was the entity responsible for all of the trading for the joint venture, and was comprised of three individual members and managers, Cal Fishkin, Igor Chernomzav, and Kent Spellman. NT Prop was tasked with funding the venture, and included two members who were also limited liability corporations—NT Financial and Pfeil Commodity Fund ("Pfeil Commodities"). The sole member, manager and owner of Pfeil Commodities was Richard Pfeil ("Pfeil"), who was known as the "money man" for the joint venture and is the defendant in this case. NT Prop was managed by two individuals, William Anthony, who was Pfeil's attorney, and Larry Nocek.

Under the terms of the Joint Venture Agreement, NT Prop would provide the money to fund the trading by TABFG. The agreement called for an initial funding in the amount of $2 million, followed by a subsequent infusion of an additional $2.5 million. At first, this arrangement appeared to function well. NT Prop provided the initial $2 million in start-up money, which came from Pfeil Commodities, and the traders proved adept at their craft, earning profits of $3.4 million.

A problem arose, however, which threatened the ability of the joint venture to continue in its mission. Before forming TABFG, Fishkin and Chernomzav (hereinafter the "Traders") were employees of Susquehanna International Group LLP ("SIG"), a company that engaged in the trading of equities,

futures, and other derivative products and securities. In that employment, the Traders were signatories to an employment contract that contained restrictive covenants which limited their ability to compete with their former employer upon leaving their jobs. The parties to the Joint Venture Agreement were aware of those limitations, and provided in that agreement for the payment of attorneys' fees and other costs necessary to escape the strictures of that employment contract. Toward that end, the Traders filed a lawsuit against SIG seeking a declaratory judgment to invalidate the restrictive covenants. SIG responded by adding TABFG and NT Prop to their lawsuit as additional counterclaim defendants seeking disgorgement of all profits, thus creating consternation among the parties to the joint venture that the money in that venture could be imperiled. On September 16, 2003, SIG obtained an injunction in a Pennsylvania district court enjoining the Traders for nine months after their departure from SIG from trading any security that they had traded within the last three months of their employment with SIG, and enjoining them from associating with each other on a securities trading business for nine months. That prevented the Traders from working together to trade on behalf of TABFG, and spelled the end of the joint venture because their combined trading prowess was the cornerstone of the venture. The Joint Venture Agreement provided that "[u]pon termination of the Joint Venture, a Reconciliation Statement will be prepared by NT Prop and delivered to the parties within fifteen (15) days after termination, and all profits and the Hold Back, if any, shall be concurrently distributed to the respective parties." The district court concluded that the venture effectively ended when the

injunction was entered, and that the terms of the Joint Venture Agreement required a disbursement of funds as of October 2, 2003. The district court found that the Joint Venture Agreement provided for an even split of the profits between TABFG and NT Prop less expenses and payments. A letter of October 3, 2003, from counsel for the Traders sought a distribution of funds under the Joint Venture Agreement, and noted that a refusal by NT Prop to distribute such finds would constitute a breach. The Traders in that letter also expressed a willingness to continue to trade under the Joint Venture Agreement, but acknowledged that such a course of action might not be in the best interest of the parties.

Numerous discussions ensued between the parties as to the amounts due from NT Prop to TABFG under the agreement, and NT Prop created spreadsheets in an effort to detail the amounts owed. The parties failed to agree as to the final accounting, but Fishkin on behalf of TABFG literally begged Pfeil to distribute what was owed to TABFG so that it would have the funds needed to mount a defense in the lawsuit by SIG.

On January 6, 2004, Pfeil caused NT Prop to distribute $360,000 to TABFG, $533,023.69 to NT Financial, and $2,742,182.02 to Pfeil Commodities, which he solely owned and which funds he acknowledged went to him personally and for his own personal use. Pfeil and Nocek signed an agreement two days later, on January 8, 2004, purporting to authorize that distribution, and Pfeil signed it as a manager although the only managers of NT Prop in fact were Nocek and Anthony. After the distribution, approximately $200,000 was left in the assets of the joint venture, which was mainly spent for legal fees and

taxes. In September, 2004, NT Prop was involuntarily dissolved by the Illinois Secretary of State.

TABFG subsequently filed a lawsuit against Pfeil, alleging among other claims that Pfeil tortiously interfered with the contractual obligations of NT Prop in its Joint Venture Agreement under which the distribution of profits was supposed to be evenly split between TABFG and NT Prop, less expenses and payments. Under Illinois law, which applies to this claim, a claim of tortious interference requires proof of a legally enforceable contract of which the defendant had knowledge, and the defendant's intentional interference inducing a breach by a party to the contract, resulting in damages. *Stafford v. Puro*, 63 F.3d 1436, 1441 (7th Cir. 1995); *Dallis v. Don Cunningham & Assoc.*, 11 F.3d 713, 717 (7th Cir. 1993). Essentially, TABFG asserted that when Pfeil, who was not an officer, director or manager of NT Prop, engineered a distribution of the bulk of the joint venture funds to himself, he tortiously caused NT Prop to breach its contractual obligations under the Joint Venture Agreement to TABFG on that date.

After a bench trial, the district court judge agreed with TABFG, and awarded judgment to TABFG against Pfeil. In so holding, the district court judge explicitly found Pfeil to be not credible in his testimony, and found Fishkin and Chernomzav very credible. In reviewing the decision of the district court, we review factual findings for clear error, with special deference to the district court's determinations of credibility that are not contradicted by extrinsic evidence. *Furry v. United States*, 712 F.3d 988, 993 (7th Cir. 2013); *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012).

Pfeil raises two challenges to the district court's decision. First, he asserts that the claim of tortious interference is barred by the statute of limitations. Second, he asserts that his distribution of the funds was protected by privilege, and therefore he cannot be held liable for that distribution. We take these arguments in turn.

The relevant statute of limitations for a claim of tortious interference with contract is five years, and Pfeil argues on appeal that the limitations period began to run on October 2, 2003. According to Pfeil, the Joint Venture Agreement was effectively terminated when the Pennsylvania district court entered the injunction against the Traders, thus triggering the requirement in the Joint Venture Agreement that NT Prop prepare a Reconciliation Statement and distribute the funds within 15 days. Pfeil asserts that the failure to distribute the funds within that time period constituted a breach of contract on October 2, 2003, and therefore that is the relevant date of breach for limitations purposes.

As an initial matter, we note that this argument was first made to the district court in the Motion to Alter or Amend the Judgment after the adverse trial verdict was rendered against Pfeil. A party cannot withhold a statute of limitations claim like a trump card, to be played in the event that the trial ends unfavorably. That is essentially what happened here. In his Answer to the Complaint, Pfeil raised as an affirmative defense the following statute of limitations claim, though he never argued it further after that time:

> Plaintiff's claims are barred by the statute of limitations. Plaintiff knew or had reason to know of the

distributions allegedly made by NT Prop prior to January 2004 and failed to file the instant lawsuit within the applicable statute of limitations period.

That is a distinct argument from the one made in the post-judgment motion and before this court on appeal. In that affirmative defense, Pfeil alleges that TABFG had knowledge of distributions by NT Prop prior to the January 2004 distribution, and that the limitations period began to run as of those earlier distributions. On appeal and in the post-judgment motion, however, Pfeil asserts that the Joint Venture Agreement was breached on October 2, 2003, when distributions were required following the termination of the contract but not made, and therefore that the distribution in January 2004 could not trigger the limitations period because that distribution clause had already been breached on October 2nd. In fact, Pfeil recognized that its argument could be perceived as distinct from its affirmative defense in the answer, and in the Motion to Alter or Amend the Judgment Pfeil sought leave to amend that affirmative defense to reflect the new approach. The failure to raise a specific statute of limitations argument may constitute a waiver even if other statute of limitations arguments are raised. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 626 (7th Cir. 2010). Here, the failure to raise, or pursue, the statute of limitations argument before judgment was entered after trial presents the issue of waiver. TABFG never argued waiver, however, and the district court also did not consider that possibility. We have often noted that parties can waive waiver by failing to assert it, and because the district court and the parties addressed the issue solely on the merits, and there is in fact no merit to the argument, we limit our discussion to the

merits as well. See *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003).

The failure to disburse the payment within the 15 days was not treated by any party as an abrogation of the duty to distribute the payment itself, and it is apparent that the failure to disburse within the 15 days was not a material breach. In fact, the parties routinely disregarded the timeliness requirements of the contract. See *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 716 (7th Cir. 1993) (noting Illinois cases holding that there is no material breach where conduct indicates acquiescence such as an acceptance of delays and an absence of demand for performance). The contract required NT Prop to fund the original $2 million, and although $1 million was paid, the additional $1 million was delayed beyond the time provided in the Joint Venture Agreement. Pfeil, who was known as the "money man" behind those payments, also delayed and ultimately failed to release the subsequent $2.5 million required by the contract. The failure to disburse within the 15 days was treated no differently by the parties, who continued to negotiate the amounts owed in the disbursement through the ensuing months until Pfeil distributed the money on January 6. It was only at that point that there was a breach of the disbursement requirement of the contract, because that was the point at which it became clear that the money would not be disbursed in the manner required by the contract. Pfeil in fact argued in a motion in limine that evidence of any breach prior to January 2004 should be excluded, a position firmly counter to the contention now that the claim is outside the statute of limitations because a breach occurred prior to January 2004. The court properly determined that the obliga-

tion to disburse continued until the January 2004 date, and that the statute of limitations for the tortious interference claim began to run as of the date of that breach.

Pfeil next argues that his action in distributing the funds was privileged, and therefore that he cannot be held liable for that action. The Illinois Supreme Court has recognized a privilege in tortious interference cases where the interest which the defendant was acting to protect is one which the law deems to be of equal or greater value than the plaintiff's contractual rights. *HPI Health Care v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 677 (Ill. 1989). Illinois has therefore granted a conditional privilege to managers or corporate officers that protects them from personal liability for their decisions made on behalf of the corporation. *Id.*; *Nation v. American Capital, Ltd.*, 682 F.3d 648, 651–52 (7th Cir. 2012); *Stafford*, 63 F.3d at 1442. The privilege is necessary because a corporation acts through its agents, and the duty that those agents owe to the corporation's shareholders outweighs their duty to the corporation's contract creditors. *Stafford*, 63 F.3d at 1442; *HPI Health Care*, 545 N.E.2d at 677. The business judgment rule is the basis for the privilege. *Nation*, 682 F.3d at 652. "Because the interests of corporate officers, directors, and shareholders are sufficiently aligned with those of the company, they generally cannot be liable in tort when they interfere with the company's contract for the benefit of the company." *Id.* The utility of such a rule is clear. For instance, a company facing a liquidity crisis may need to take measures to address the cash flow problems such as deferring payments to vendors and renegotiating terms with suppliers. Such actions taken to protect the future of the company and the ongoing viability of those business relationships should not result in

tort liability to those agents acting in the company's best interests. See *Nation*, 682 F.3d at 653. Those agents are not protected from any and all decisions, however. The privilege extends only to acts undertaken on behalf of the corporation, and corporate officers "are not justified in acting solely for their own benefit or solely in order to injure the plaintiff because such conduct is contrary to the best interests of the corporation." *Stafford*, 63 F.3d at 1442, citing *HPI Health Care*, 545 N.E.2d at 678

Pfeil maintains that the district court misapplied the law. According to Pfeil, a person subject to privilege cannot be held liable unless that person was acting only for his own personal benefit *and* acted contrary to the interests of the corporation. See *Nation*, 682 F.3d at 653; *Von Der Ruhr v. Immtech Intl.*, 570 F.3d 858, 866 (7th Cir. 2009). Pfeil maintains that the district court considered only the first part of that test, and upon finding that Pfeil distributed the money for his own personal interest, ended the inquiry and held that the privilege did not therefore shield him from liability. Pfeil asserts that his actions were in the interests of NT Prop, and therefore he cannot be held liable.

There are several problems with this argument, not the least of which is that Pfeil was not a manager, director or officer of NT Prop, and was not authorized to act on NT Prop's behalf. Pfeil has presented no argument that he was somehow the *de facto* manager of NT Prop, and in fact argued at various times against any attempt to equate him with NT Prop. He was merely the sole member of one of two members of NT Prop, albeit the person who ultimately provided virtually all of the funds for the enterprise. Absent authority to act on behalf of

NT Prop, the privilege does not attach. The district court, however, did not explore whether Pfeil was authorized to act on behalf of NT Prop, noting merely that he was pulling the strings all along. Given the lack of fact findings as to his role in the corporate structure, we will not address whether the privilege applies as an initial matter, and instead will consider only the district court's decision that the conditional privilege was overcome.

The district court held that Pfeil's act in distributing the money was a personal one, not a corporate one at all, and that it was done solely for his own personal benefit. The court also rejected as not credible Pfeil's contention that he believed the hold-back provision in the contract reduced the amount owed to TABFG to less than $360,000. The court noted that under the plain language of the Joint Venture Agreement the hold-back provision did not apply, and that it was clear that TABFG was owed significantly more than $360,000.

We have repeatedly recognized that actions taken solely for one's own personal benefit are not actions taken in the interests of the corporation. *Stafford*, 63 F.3d at 1442; *Dallis*, 11 F.3d at 717; see also *HPI Health Care*, 545 N.E.2d at 678. Moreover, Pfeil himself testified that he was unaware of the terms of the distribution agreement, or the numbers in the spreadsheets prepared by NT Prop, although he was aware of the existence of those documents. Therefore, by his own admission, he did not attempt to determine the legal responsibilities of NT Prop before distributing the funds, nor did he attempt to allocate that distribution in a manner consistent with the numbers in the spreadsheet developed by NT Prop to determine the proper distribution. Furthermore, as the district court pointed

out, the bulk of the money was put into Pfeil's own pocket, not into a trust or escrow or other account designed to protect the interests of NT Prop. The district court found Pfeil not credible in indicating that he was not aware of the numbers, but that too leads to the conclusion that he was not acting in the interest of NT Prop, because he did not distribute the funds in the manner required by that agreement and there was no apparent corresponding benefit to NT Prop in his failure to do so. The spreadsheet prepared by NT Prop revealed that significantly more money was owed TABFG than the $360,000 paid. The only benefit from Pfeil's skewed distribution of that money was to Pfeil personally. The failure to ascertain the legal obligations of NT Prop and the allocation of the funds for his own personal benefit support the district court's determination that Pfeil was acting solely in his own interest and not in the best interest of NT Prop. Moreover, the district court's holding that TABFG did not receive the funds to which it was entitled under the Joint Venture Agreement further establishes that the distribution was not in NT Prop's interest. There is no evidence that in failing to comply with that legal obligation Pfeil gained some other benefit to NT Prop, and in fact NT Prop was involuntarily dissolved within 9 months of that distribution. The findings by the district court establish that Pfeil acted solely for his own personal benefit, and that the distribution was not in the interest of NT Prop, and therefore Pfeil is not shielded from liability by privilege.

The decision of the district court is AFFIRMED.